Filed 11/27/13 P. v. Marks CA3

NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DENA MARKS,<br><br>Defendant and Appellant. | C071232<br><br>(Super. Ct. No. 11F01025) |

After the trial court denied her motion to suppress evidence (Pen. Code,[1] § 1538.5), a jury found defendant Dena Marks guilty of attempted voluntary manslaughter, aggravated mayhem, and assault with a deadly weapon. The jury also found true allegations that defendant personally used a knife and personally inflicted

---

[1] Further undesignated statutory references are to the Penal Code.

great bodily injury. The trial court found defendant had one strike and sentenced her to prison.

Defendant appeals, contending the trial court erred in denying her motion to suppress evidence found in a warrantless search of her apartment. We agree that the trial court erred and the People have not shown the error was harmless beyond a reasonable doubt. Accordingly, we reverse.

## BACKGROUND

### *The Suppression Hearing*

*Evidence Presented*

Sacramento Sheriff's deputies dispatched to investigate a stabbing at an apartment complex met the victim, Blancy Adams, at the nearby 7-Eleven. Adams was bleeding from a fresh cut along his jaw. Witnesses (including Adams) reported that defendant had stabbed Adams, identifying her by name and describing her as a White female, "about five-six, around 230, 240 pounds" with a prosthetic leg. Defendant lived in apartment 35 and the stabbing had occurred in apartment 49 of the same complex. At the time of the stabbing, defendant had been wearing white pajama pants with Mickey Mouse graphics, and a red T-shirt.

Deputies Crowley and Croteau went to apartment 35. Defendant's teenage daughter opened the door and allowed them inside to talk to defendant. Defendant was lying on an air mattress in the living room, just inside the front door. She had only one leg, was not wearing a prosthetic, and was wearing yellow pajamas. Croteau told defendant they were investigating her involvement in a stabbing that occurred in apartment 49. Defendant said she had not been "over there." Deputy Silvey soon arrived at the scene; he too questioned defendant. Silvey was also walking around the apartment.

At the hearing, Silvey candidly offered repeatedly that he could not remember the apartment's layout, testifying that since the time of the crime, "a year and a half ago,"

he had been to "probably 2,000 apartments." At one point on the evening of the stabbing, he stood in the part of the living room he was "guessing" was about 25 feet from defendant, near a short ("probably five, six feet") hallway leading to the bath and bedroom. As he looked into the hallway from the living room, he saw that the closet door at the end of the hallway was open.[2] On the floor of the closet, just inside the door, was a white plastic bag. Silvey testified the bag drew his attention because defendant was not wearing the clothing described by witnesses, so "I was looking around the apartment to see if I -- if it was laying out in the apartment." As he "walked up to the bag," Silvey "looked in the bag and there's Mickey Mouse looking back at me."

Silvey pulled the Mickey Mouse pants from the bag, and showed them to defendant. She denied having worn them. No blood was found on the pants. At some point--the record is unclear as to precisely when in the sequence of events this particular sighting occurred--Silvey saw defendant's prosthetic leg leaning against the wall of the closet "near the bag of clothing." Defendant told Silvey she had not been wearing the leg for at least "the last couple of hours." Silvey found in the closet, near the prosthetic leg, a suction liner which is generally worn between inside the prosthetic. The liner was warm to the touch, from which Silvey concluded the leg had been worn recently.

*Ruling*

It was undisputed that no warrant was obtained, and the trial court found no consent to search the apartment. However, the court found Silvey was conducting a protective sweep of the apartment,[3] during which he saw the prosthetic in the open closet

---

[2] Silvey sketched the apartment's layout at the hearing, as well as identified photographs of the relevant living room, closet, and clothing; these exhibits are in the appellate record and we have reviewed them.

[3] Although not specifically using the term "protective sweep" in its ruling, the trial court described Silvey's conduct as walking "around the area where [the deputies] are in just to make sure that there's nobody else there or that there's no other circumstance that would

and then noticed the pants in the bag on the closet floor; accordingly, the court denied the motion to suppress.[4]

*The Trial*

Defendant was charged with attempted murder (count one), aggravated mayhem (count two), and assault with a deadly weapon (count three). It was also alleged she had suffered one prior strike conviction.

*People's Case*

Defendant knew Adams before the stabbing; he was visiting Sacramento and staying at (defendant's sister) Diane's apartment, number 49. Diane, Adams, his brother, and others were with defendant and her daughter in apartment 49 at the time of the stabbing. Defendant was wearing her prosthetic leg.

After defendant and Adams exchanged words which included a reference by Adams to the "Gangsta bitch" tattoo on defendant's neck, defendant told Adams: "You want to see Gangsta bitch, I'll show you Gangsta bitch," and walked out of the apartment. She soon returned, said she was going to kill Adams, and slashed at his neck and cheek with a knife. Adams fled to the 7-Eleven across the street. He had received a deep stab wound that sliced his jugular vein and was life threatening. The cut to his face left a scar.

After her preliminary hearing, defendant told her husband she intended to "run"; the recorded phone conversation was played for the jury.

On rebuttal, Silvey testified he found six drops of blood in apartment 49 and saw no blood in apartment 35.

---

pose a danger to them" and also as "walking around that front living area just to make sure there wasn't anything else he [should be] aware of or be concerned about . . . . ."

[4] The trial court added that, even if there were "arguably a [Fourth Amendment] violation in this case," Silvey's conduct was not "so outrageous as to justify suppressing [the evidence]."

*Defendant's Case*

Defendant testified she was never actually inside apartment 49 the night of the stabbing, although she had an argument with Adams while outside the apartment. She went home to apartment 35 after the argument. Adams then came to apartment 35 and argued with her again and insulted her, cursed her, and climbed on top of her after she refused to give him Oxycontin; he then pulled oxygen tubes out of her nose, and she felt she couldn't breathe and he might rape her. She then "cut him" with the scissors. Although it was only "5 to 15" minutes later that the deputies arrived at her apartment, she did not call 911 and did not report the incident because she was "confused" and she had previously been told not to talk to the police without a lawyer present. Defendant denied that she wore her prosthetic leg at all on the day of the stabbing. She had, however, often worn the prosthetic's lining alone for medical reasons.

Defendant admitted telling her husband she planned to run rather than face trial because of her poor health. She also admitted a 2004 conviction for residential burglary.

Defendant's sister Diane testified that she was sleeping in her bedroom when Adams was cut somewhere outside her apartment, and she was awoken by Adams's screaming.

*Verdicts and Sentencing*

The jury acquitted defendant of the charge of attempted murder. It convicted her instead of the lesser offense of attempted voluntary manslaughter, as to which it also found she personally used a knife, and personally inflicted great bodily injury. The jury also convicted defendant of aggravated mayhem (as to which it found she personally used a knife), and assault with a deadly weapon (as to which it found she personally inflicted great bodily injury). The trial court found defendant had suffered one prior strike conviction, and denied her motion to strike it.

The court sentenced defendant to a determinate term of six years, plus an indeterminate term of 14 years to life.

## DISCUSSION

Defendant contends the trial court erred in denying her motion to suppress. As we will explain, we agree with defendant that the trial court's relevant findings of fact are not supported by substantial evidence. Further, the good faith exception to the warrant requirement does not apply. Because the People cannot show the error was harmless beyond a reasonable doubt, we must reverse the judgment.

I

*The Law*

The Fourth Amendment guarantees the right to be free of unreasonable searches and seizures by law enforcement personnel. (U.S. Const., 4th Amend.) "'It is a "basic principle of Fourth Amendment law" that searches and seizures inside a home without a warrant are presumptively unreasonable.' [Citation.]" (*People v. Thompson* (2006) 38 Cal.4th 811, 817, quoting *Payton v. New York* (1980) 445 U.S. 573, 586, 585 [63 L.Ed.2d 639].) When police conduct a search or seizure without a warrant, the prosecution has the burden of showing the officers' actions were justified by an exception to the warrant requirement. (*People v. Camacho* (2000) 23 Cal.4th 824, 830; *People* v. *Chavez* (2008) 161 Cal.App.4th 1493, 1499.)

The "protective sweep" doctrine is a recognized exception to the warrant requirement for searches and seizures. (See *Maryland v. Buie* (1990) 494 U.S. 325, 327 [108 L.Ed.2d 276, 281] (*Buie*).) Officers may conduct a limited, brief search of premises to ensure officer safety, if they have a reasonable suspicion that the area to be swept harbors an individual who poses a danger to those on the scene. (*Ibid*., see also *People v. Ormonde* (2006) 143 Cal.App.4th 282, 292.) Officers conducting a protective sweep who see an item in plain view, which they have probable cause to believe is evidence of a crime or contraband, may lawfully seize it without a warrant. (*Buie, supra*, 494 U.S. at

p. 330 [108 L.Ed.2d at p. 283]; *Arizona v. Hicks* (1987) 480 U.S. 321, 325-327 [94 L.Ed.2d 347, 354-355]; *People v. Clark* (1989) 212 Cal.App.3d 1233, 1238-1239.)

When reviewing the denial of a suppression motion, we view the record in the light most favorable to the trial court's ruling, and defer to the trial court's express or implied factual findings if supported by substantial evidence; we exercise our independent judgment to determine whether, on the facts found, the search or seizure was reasonable under the Fourth Amendment. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1118-1119; see *People v. Weaver* (2001) 26 Cal.4th 876, 924.)

## II

## *Analysis*

### A. *Protective Sweep*

As we described *ante*, the trial court impliedly found that the seizure of the pants and prosthetic was lawful because Silvey was engaged in a protective sweep of the apartment when he located the items at issue. However, no evidence supports this conclusion. Our careful review of the record reveals no evidence that Silvey was looking for dangerous people inside the apartment. Rather, he was talking with defendant and looking for *evidence of the crime*. Silvey candidly testified that he was "walking about the apartment" and "looking around the apartment to see if" the clothing associated with the crime "was laying out in the apartment." Silvey testified he never even went into a bedroom--further evidence that he was not conducting a protective sweep.

Justifying a protective sweep requires that the People present "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." (*Buie, supra,* 494 U.S. at p. 334.) The People admitted the absence of such facts; indeed, when referencing the protective sweep doctrine (after it was raised by the judge) in his argument at the hearing, the prosecutor said: "we did not hear evidence of this and I'm not suggesting that we did." Substantial

evidence does not support the trial court's conclusion that Silvey observed the evidence while engaged in a protective sweep.

B. *Plain View*

The People posit that Silvey could see both defendant's prosthetic and the pants from his position in the living room, an area where he was permitted to be. Even assuming for the sake of argument that Silvey was legally entitled to roam through the living room and look down the hall, he did *not* testify that he could see either the prosthetic or the pants *from the living room*. Instead, he testified that he saw a white plastic bag on the closet floor and it drew his attention because he was looking for the clothes described by witnesses. Only when Silvey "walked up to the bag" could he see the pants inside it.[5] He first testified to the presence of the prosthetic in the closet when asked if there was "anything else that drew [his] attention" while he was in the apartment; he answered that defendant's "prosthetic leg was leaning against the wall near the bag of clothing." He never testified that the prosthetic leg (let alone its liner) could be seen from the living room, nor was he even asked.

Alternatively, the People argue the exhibits (if not the testimony) introduced at the suppression hearing provide support for the notion that the prosthetic was in plain view from the living room. The People are mistaken; neither the exhibits nor Silvey's testimony support their argument. Instead of relying on the evidence, the People attack defendant's argument by stating that "it appears appellant has not reviewed the exhibits" and speculating as to how Silvey "could have" looked one way or the other to see into the closet and how it is "reasonable to believe that Silvey could have seen" the items in plain

---

[5] The trial court and prosecutor together theorized that Silvey first noticed the prosthetic through the open closet door, walked over to investigate, saw a bag of clothes, and looked into the bag to discover the pants. But the record does not support this theory, as we describe throughout.

view. But this approach--speculating as to what Silvey *could have* done--ignores the fact that Silvey testified as to *what he did*, to the best of his admittedly and understandably remote recollection. He did not testify that he did what the People now hypothesize he "could have" done.

Further, we have reviewed the exhibits and disagree that they support the People's musings. None even remotely show Silvey's view from the living room into the open closet, much less his view into the white bag.[6] The People failed to lay a foundation at the hearing as to where the photographer was when these photographs were taken and whether Silvey was in the same location at any point during his search. Nor did Silvey testify about the location from where the photos were taken. Without that foundation, it is impossible to conclude the photographs prove Silvey could see any of the relevant items from the living room. Because Silvey did not testify that he saw the seized items from the living room, and no other evidence indicates that he did, the trial court's findings on this point are not supported by substantial evidence.

C. *Good Faith Exception*

Finally, the People argue the trial court properly denied defendant's suppression motion because Silvey's conduct was "simple negligence," citing *Herring v. United States* (2009) 555 U.S. 135 [172 L.Ed.2d 496] (*Herring*). *Herring* involved an officer who reasonably, but mistakenly, believed there was an outstanding warrant for the

---

[6] People's Exhibit 10 shows the clothing at issue spread on the living room floor, clearly after its seizure; the People introduced it at trial only to identify defendant's pants. Exhibit 11 shows the living room with the corner of defendant's airbed in the foreground and the entrance to the hallway in the background and was introduced for a purpose that is not clear from the record. Exhibit 12 is a close-up of the linen cabinet next to the closet; it is referenced only as a broad cite in the People's briefing and was barely identified at trial by Silvey. Exhibit 13 is a close-up of the closet's open door. The prosthetic leg is in the closet but the white bag of clothing (that first drew Silvey's attention per his testimony) is not.

defendant. The officer's belief was reasonable because the clerk had actually provided him with incorrect information--that defendant's arrest warrant was active when in fact it had been recalled. (*Herring, supra*, 555 U.S. at pp. 137-138 [172 L.Ed.2d at pp. 501-502].)

*Herring* is not on point to this case. In *Herring*, the officer made a reasonable mistake of fact--thinking a recalled warrant was active--because of others' negligent failure to update the relevant database. His error was "the result of isolated negligence attenuated from the arrest." (*Herring, supra*, 555 U.S. at p. 137 [172 L.Ed.2d at p. 502].) Here, the deputy was (at best) mistaken about the *law*--what it allowed him to do and what it did not. His mistake was in no way attenuated from his discovery of the evidence at issue. To the contrary, his mistake was inextricably intertwined with the constitutional violation. Here, unlike the officer in *Herring*, Silvey *knew* that he was searching defendant's apartment without a warrant, without consent, and without exigent circumstances; the record is devoid of any evidence of any belief on his part of the existence of any factual basis, whether correct or incorrect, that could allow him to conclude that his warrantless search of the apartment for evidence was legally permissible. No matter what may have been his state of mind (and the record is devoid of any evidence of this as well), and to what extent his search of the apartment may have seemed practical and expedient at the time, the search was without legal basis and thus showed a "reckless disregard of constitutional requirements," see *Herring, supra*, at page 147 [172 L.Ed.2d at p. 509], violated the Fourth Amendment, and warrants suppression of the evidence resulting therefrom.[7]

---

[7] Although the People argue that Silvey "had a right to look around the living room" to ensure the room was free from weapons or "dangerous third persons," this argument borders on disingenuous given the specific circumstances of this case and their concession below that there was no evidence supporting the theory that Silvey was engaged in a protective sweep. As we have explained at length *ante*, no evidence

III

*Harmless Error*

We arrive at the question of whether the trial court's error in denying defendant's motion to suppress, thereby permitting the People to introduce at trial evidence of the prosthetic leg and (warm) liner, as well as the pants, was harmless beyond a reasonable doubt. (See *People v. Tewksbury* (1976) 15 Cal.3d 953, 970-972; *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] (*Chapman*).)

This court has described the test for the *Chapman* standard as follows: "To find the error harmless we must find beyond a reasonable doubt that it did not contribute to the verdict, that it was unimportant in relation to everything else the jury considered on the issue in question." (*People v. Song* (2004) 124 Cal.App.4th 973, 984 (*Song*); see *Yates v. Evans* (1991) 500 U.S. 391, 403-404 [114 L.Ed.2d 432, 448-449].) Even where the defense is weak, that does not make the evidence that should have been suppressed unimportant. (See *People v. Scott* (1978) 21 Cal.3d 284, 295-296.)

The presence of the pants and warm prosthetic liner in apartment 35, together with other evidence of identification, certainly established defendant stabbed Adams. But because defendant testified and admitted that she stabbed Adams, her identity as the person who stabbed Adams was never in dispute. The key issue at trial was the *context* in which the stabbing occurred--where and why defendant attacked Adams. This determination of context was critical because defendant's theory was self-defense, and her testimony supported that theory. The testimony of the victim and his brother that the attack was unprovoked and occurred in apartment 49 contradicted the defense theory. Their testimony was supported in large part by the illegally seized evidence; evidence that defendant had recently worn the very same, distinctive outfit, including the

---

supports the notion that Silvey was searching for anything other than specific clothing, nor did the People present any articulable facts below which would justify such a sweep.

prosthetic, that Adams and his brother had described her as wearing at the time of the attack, supported those witnesses' version of the evening's events. Thus, the illegally-seized evidence supported the testimony (and credibility) of the People's witnesses and also severely undermined defendant's testimony and her credibility.

The prosecutor's closing argument emphasized the importance of this evidence: "She has changed her clothes. She has taken off her prosthetic. The prosthetic is still warm to the touch. . . . Why are these details important? Consciousness of guilt; changing her appearance, hiding the evidence, trying to look innocent, trying to look harmless." And "Two diametrically opposed stories . . . and only one [is] true and only one is supported by the evidence. Only one makes any sense." And again in rebuttal argument, the prosecutor emphasized the change of clothing, defendant's reaction to Silvey's confronting her with the pants he had found, and the warm leg liner as evidence that defendant lacked credibility.

Unlike the People, we do not find the fact that six droplets of blood, never analyzed, were located in apartment 49 to be key evidence that defendant's acts of violence were committed in the manner described by the People's witnesses. Though perhaps mildly corroborative of Adams's version of the attack, the evidence of six droplets of blood (purportedly from a stab wound to the *jugular* vein) is far from overwhelming. In fact, this incongruous blood evidence may well have added to the confusion as to precisely where the stabbing took place and under what circumstances.

Although the People argue defendant's testimony was not credible because of her failure to report the crime and her professed desire to flee, the credibility of the witnesses is a jury determination. Here, that determination was made by jurors who had heard evidence and argument regarding highly persuasive but illegally-seized evidence substantiating the victim's claims in a critical area of dispute--the context of the

stabbing.[8] (See *Song, supra*, 124 Cal.App.4th at p. 985 [where improperly admitted statements strongly corroborated the victim's credibility on a key point, error not harmless beyond a reasonable doubt].) Despite potential problems with defendant's credibility, her version of the events of the evening supported her self-defense claim. Even after considering the illegally-seized evidence, this jury did not accept the People's entire case against defendant; it acquitted her of attempted murder, despite hearing Adams's testimony that defendant said "she was going to kill" him.

"The [*Chapman*] inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 [124 L.Ed.2d 182].) Here, the People have failed to show that the verdicts of guilt were surely unattributable to the admission of the illegally-seized evidence. For all the reasons we describe *ante*, we cannot say the error was harmless beyond a reasonable doubt.

---

**8** The People's assertions that the jury was "entitled to conclude that [defendant's] explanation was not believable" and that "[e]ven if the [evidence] had been suppressed, the jury could have easily concluded that [Adam's] and [his brother's] testimony was believable" miss the point. Although technically accurate, these assertions, concerning what the jury was entitled to do or possibly could have done, do not belong in an argument supporting a finding of harmless error under the *Chapman* standard, where the People have the burden of proof. Here, unless we can say beyond a reasonable doubt that the jury would have *necessarily* reached the same conclusions, reversal is required.

## DISPOSITION

The judgment is reversed.

DUARTE, J.

We concur:

MURRAY, Acting P. J.

HOCH, J.