[No. H028471. Sixth Dist. Aug. 25, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD A. ORMONDE, Defendant and Appellant.

## COUNSEL

Garcia, Schnayerson & Mockus, Philip A. Schnayerson and Joseph Mockus for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Joan Killeen and Frances Marie Dogan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**McADAMS, J.**—Following the denial of his motion to suppress evidence pursuant to Penal Code section 1538.5, defendant Richard A. Ormonde pleaded no contest to possession of cocaine for sale (count 1), possession of methamphetamine for sale (count 2), possession of methylenedioxy amphetamine for sale (count 3), possession of marijuana for sale (count 4), and possession of an assault weapon (count 5). (Health & Saf. Code, §§ 11351, 11378, 11359; Pen. Code, § 12280, subd. (b).) He also admitted in connection with the first three counts that he was personally armed with a firearm, and in connection with count 4, that he was armed with an assault weapon. (Pen. Code, § 12022, subds. (a)(2) & (c).) Finally, he admitted that he was ineligible for probation on counts 1 and 2, and that he had suffered two prior felony convictions.

Defendant's postplea motion for reconsideration of the ruling on the suppression motion was denied, as was his petition for referral to the California Rehabilitation Center (CRC). Defendant was sentenced to state prison for three years eight months.

On appeal defendant contends that the trial court erred in denying his motion to suppress, and abused its discretion in rejecting his bid for a CRC referral. We agree that the suppression motion should have been granted, and we reverse the judgment.

## STATEMENT OF FACTS[1]

Detective Patrick Clouse of the City of Santa Clara testified that on April 11, 2003, around 5:55 p.m. he responded to a radio call about a domestic violence incident that had occurred in the area of Homestead Road. He was originally directed to Woodhams and Homestead Roads, where the victim was located, but when he arrived there he was redirected to 2940 Homestead Road, apartment 2, where the suspect was supposed to be. Detective Clouse explained that at this point in his career as a police officer, he had responded to hundreds of domestic violence calls, and he considered them "one of the most dangerous" and "highly unpredictable" things a police officer could do. The danger stemmed from the fact that there was a lot of emotion involved, the incidents typically took place at a house where there were frequently guns and knives, and where there were "also frequently sympathetic parties other than the two combatants, such as family members, friends, parents, people that have an emotional stake in what's occurring and are not happy about the police being involved in their personal business and who also may want to protect the victim and/or suspect." On numerous occasions he had had to "arrest more than just the suspect because of violence that has been . . . perpetrated on the police or on . . . other people involved, after our arrival."

When he arrived at 2940 Homestead Road, he parked on the street. Officer Carreira arrived in a separate car, and also parked on the street. As they entered the driveway area to the apartment complex, Detective Clouse saw an individual, later identified as Christopher Olson, standing near a car that was parked in front of apartment B (not 2). Olson was 10 feet from the front door of that unit; "the driver's side door of the vehicle was practically even with the front door, so you could have gotten out of the driver's side door of the vehicle and walked directly into the front door." The door was wide open. Since Clouse was not sure at this point that Olson was the individual they were supposed to arrest, he contacted Olson. Olson immediately became slightly argumentative and voiced some protest over being arrested. Officer Carreira assumed responsibility for dealing with him while Clouse surveyed the door to the apartment, which he believed was in some way connected with Olson. Clouse had been informed by either Carreira or Officer Leipelt via radio that Olson had been either staying or working at the apartment, which belonged to a friend of his. Clouse believed that the domestic violence incident in which Olson was the suspect had occurred either inside or outside the residence.

---

[1] The facts are drawn from the evidence presented at the hearing on the motion to suppress held on June 15, 2004.

From his vantage point, Clouse could see through the open front door and the front window into the living room and partly into the kitchen, but a closed door blocked his view of the rest of the residence. Clouse felt "vulnerable" because he "didn't know if somebody was going to come out of that room with a weapon or if it was going to be somebody that was somehow going to be sympathetic to Olson, who was now making somewhat of a scene in front of the residence." He said: "I don't think that I thought there were people in the house, I was just trying to determine if there were people in the house." He did not ask Olson if there was anybody inside the house because Olson was being uncooperative. Regardless of what Olson might have said if Clouse had asked him, Clouse would have wanted to verify for himself whether the house was occupied. He believed that his safety and the safety of the other officers would be jeopardized if he did not enter the house.

Clouse stepped up to the door and into the residence, simultaneously announcing, "Santa Clara Police Department" in a loud voice. He did not knock because the door was open. He had stepped two to three feet into the room when the back door opened and defendant, a woman and a young girl came out. Clouse asked them to step outside to talk to him. As they walked outside, Clouse explained that he was investigating a domestic violence incident. While he was inside, Clouse did not search or see any contraband.

Once they were outside, other police officers began to arrive and Olson continued to make a "spectacle" of himself. Clouse asked the woman if she and her child would like to go back inside. They did so.

Defendant remained outside with Clouse. Clouse explained that Olson had committed some kind of domestic violence crime and the police were there to arrest him. Clouse asked defendant what his relationship to Olson was, if he knew the woman who had accused Olson, and if he had heard or seen anything involving the domestic violence. Defendant replied that he and Olson were friends, and that Olson had been at the house for the last few days remodeling the kitchen. He said he knew the woman, but had not witnessed any violence.

Before or during the conversation, Clouse received information that Olson was a methamphetamine user, and he asked defendant if he knew whether Olson used drugs of any kind. Defendant said he was not sure, but he thought Olson might be a drug user. Clouse asked defendant if there was any chance that Olson had left any property, including drugs or paraphernalia, inside the residence. Defendant replied that it was possible, but that the only area to which Olson had access was the kitchen. Clouse then asked defendant for permission to search the kitchen for items that might belong to Olson and

defendant gave it. Clouse next asked defendant if he would mind repeating all his information to Officer Raymaker for inclusion in the domestic violence report and he reentered the residence.

Clouse went directly to the kitchen and began searching. He found a little bit of burnt marijuana and a cut straw that looked as if it could have been used to ingest drugs. While he was searching, his supervisor, Sergeant Campi, came to the window in the living room and told him that he had received information from Officer Leipelt that defendant was a drug dealer and had a quantity of drugs in the top dresser drawer in his bedroom.

Clouse knocked on the closed bedroom door to the child's room and the woman opened it. He told her he had received information that drugs were being sold in the residence by defendant. She said she did not know anything about that. He asked if she lived there and if she stayed in the second bedroom. She said that she did. He asked for permission to search the second bedroom and she gave it.

Clouse then went outside to where defendant was talking to Raymaker and told defendant "straight up" that he had information that defendant was a drug dealer. He bluffed and said he already knew about the drugs in the top dresser drawer in his bedroom. Defendant nodded "yes" and gave Clouse permission to go into the residence to get the drugs. Clouse asked defendant if there were any other drugs in the residence and defendant said there was a yellow backpack in the bedroom that also contained drugs. Defendant agreed to show Clouse where the drugs were in the bedroom. At that point, Clouse asked Raymaker to handcuff defendant, so that defendant could not grab a weapon inside the bedroom. Then he, Carreira and Raymaker accompanied defendant back into the residence.

Inside the bedroom, defendant directed them to the dresser and said, "It's in there." Clouse opened the drawer and found a ball and a plastic baggie of white powdery substance. However, he did not see the yellow backpack and so he asked defendant where it was. Defendant directed him to a cardboard box on the floor and said, "It's in there." Clouse opened the box; it contained the backpack. Inside the backpack were more drugs.

Officer Carreira also testified. Like Clouse, he was also concerned that "somebody else involved in the incident might come out [of an open door] and talk to [them]." At some point after he arrived at the scene, Officer Leipelt informed him that Olson was a methamphetamine user and that the owner of unit B at 2940 Homestead Road was a drug dealer. He confirmed that while he interviewed Olson, Clouse "ensured that there were no other victims or suspects in the residence of 2940 Homestead, number B."

Officer Leipelt testified that he contacted Kimberly Olson at the corner of Homestead and Woodhams Roads. She told him that she and her estranged husband had gotten into a fight over a phone. He was inside his car, which was parked in the driveway of 2940 Homestead. When she tried to open the car door, he pushed her away and she fell backward. She tried to go into the house, but her husband got out of the car and kicked her in the stomach, so she left and called the police. She told Leipelt that her husband was a drug user and that the person who lived there was a drug dealer. Leipelt communicated that information to Sergeant Campi, and requested via radio that the officers at the scene arrest Christopher Olson. He did not report that any of the violence had occurred inside the residence.

Andrea Myers, defendant's girlfriend, also testified. She said the doorway to unit B had a screen door, and that it was closed when the police arrived. She heard Olson yelling and stepped out of her daughter's bedroom to see what was going on. An officer saw her and started to approach the door. He yelled at her, "Get out of the house." She fetched her daughter and left the house. The officer entered the house after she left. Less than a moment later, she saw the officer walking towards the garage with defendant. She was outside the house for a few minutes talking to an officer before a different officer told her to go back inside. She walked into the kitchen and saw a police officer going through the drawers and cabinets. When she asked him what he was doing, the officer said that defendant had "told him that he might find some of [Olson's] things in there." She went into her daughter's room. A few minutes later, the officer from the kitchen came to the room. He said Olson had told him there were drugs in the house, and said something about a drawer. He then pulled her into the other bedroom and told her that if she did not give him permission to search he would come back with a warrant with her name on it and someone from Child Protective Services. She said, "If that's what you have to do." He then took her by the arms and took her back to her daughter's room and shut the door. After 30 minutes, the police let her come out of the room and they started questioning her. They did not arrest her.

Defendant testified in his own behalf. While watching television in his bedroom, he heard a commotion outside. Andrea told him Olson was getting arrested and then went outside, but he remained undecided about what to do. He stepped outside his bedroom and there was a police officer, not Clouse, standing right outside the bedroom door. The officer told him to go outside. He went outside and talked to the reserve officer. Clouse would intermittently come up to him and ask him questions about the domestic violence incident and then walk away. Clouse asked him if Olson used drugs; he asked for permission to search Olson's "stuff" in the kitchen and defendant gave it. Clouse went inside the house.

Defendant remained outside. A short time later, Clouse walked up to him and said that he had heard defendant was a drug dealer and had "stuff" in his top drawer. Defendant shook his head "no." Clouse walked away and talked to the sergeant. He came back to defendant and told him that he knew there were drugs in defendant's top drawer and that if he did not want his girlfriend and daughter to be taken to jail, he had better tell Clouse where the rest of it was. Defendant told him. Defendant was then handcuffed and taken into the house. Once inside, Clouse opened the drawer, took out the "stuff" that was in the drawer and asked where drugs were. Defendant told him they were in the box.

Officer Clouse testified in rebuttal. He did not tell defendant that he would take Andrea Myers and his daughter to jail; he entered the house the first time by himself; he did not remember seeing a white screen door at the residence; if the screen door had been shut, he would have remembered opening it to enter the residence; he specifically remembered there was no closed door of any kind in that doorway; he did not yell at Andrea Myers or take her by the arm; he did not threaten to involve Child Protective Services if she did not cooperate and he did not tell her he would get a warrant with her name on it.

## DISCUSSION

*Denial of Motion to Suppress*

Defendant argues that the officers' initial entry into defendant's apartment cannot be justified by exigent circumstances or as a protective sweep. He further argues that because his subsequent consent to search is "inextricably bound up with the illegal conduct," the fruits of the search must be suppressed. (*People v. Haven* (1963) 59 Cal.2d 713, 719 [31 Cal.Rptr. 47, 381 P.2d 927].)

### A. *Standard of Review*

" ' "An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles. [Citations.] [¶] In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] 'The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review.' [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a

mixed fact-law question that is however predominantly one of law, . . . is also subject to independent review." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 255 [96 Cal.Rptr.2d 682, 1 P.3d 3].)

### B. *Entry into Defendant's Dwelling*

■ The Attorney General contends that the initial entry into defendant's home was justified by exigent circumstances. We disagree. As our Supreme Court has recently summarized: " 'It is axiomatic that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." ' (*Welsh v. Wisconsin* (1984) 466 U.S. 740, 748 [80 L.Ed.2d 732, 104 S.Ct. 2091].) A warrantless entry is 'presumptively unreasonable.' (*Payton v. New York* (1980) 445 U.S. 573, 586 [63 L.Ed.2d 639, 100 S.Ct. 1371].) This presumption can be overcome by a showing of one of the few 'specifically established and well-delineated exceptions' to the warrant requirement (*Katz v. United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 88 S.Ct. 507]), such as ' "hot pursuit of a fleeing felon, or imminent destruction of evidence, . . . or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling" ' (*Minnesota v. Olson* (1990) 495 U.S. 91, 100 [109 L.Ed.2d 85, 110 S.Ct. 1684]). The United States Supreme Court has indicated that entry into a home based on exigent circumstances requires *probable cause* to believe that the entry is justified by one of these factors . . . . (*Ibid.*)" (*People v. Celis* (2004) 33 Cal.4th 667, 676 [16 Cal.Rptr.3d 85, 93 P.3d 1027] (*Celis*).)

In this case, Olson's arrest was for domestic battery. However, the seriousness of the offense does not, by itself, give rise to an exigent circumstance. Even a homicide does not warrant a blanket exception to the Fourth Amendment on that basis. (See *Mincey v. Arizona* (1978) 437 U.S. 385, 394–395 [57 L.Ed.2d 290, 98 S.Ct. 2408] ["We decline to hold that the seriousness of the offense under investigation itself creates exigent circumstances of the kind that under the Fourth Amendment justify a warrantless search"].)

■ The arrest was likewise occurring outside, not inside, the apartment. Olson's wife, police knew, was not inside the apartment; she was safely away from the premises. None of the police officers who testified articulated any reason to believe that other victims or suspects were involved in the battery, or inside the apartment. Indeed, Officer Clouse testified: "I don't think that I thought there were people in the house, I was just trying to determine if there were people in the house." Although the police knew Olson had some sort of connection with the apartment, they did not know what it was: Kimberly Olson told Officer Leipelt that she and her estranged husband had gotten into a fight inside his car, which was parked in the driveway of 2940 Homestead.

She said she then tried to go into the house, but he assaulted her, so she left and called the police. She also told Leipelt that her husband was a drug user and that the person who lived there was a drug dealer. Leipelt communicated all of that information to Sergeant Campi. Leipelt did not report that any of the violence had occurred inside the residence. Some or all of that information was relayed to Detective Clouse and Officer Carreira, who were instructed via radio to arrest Christopher Olson.

■ " '[E]xigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*People v. Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333].) However, an exigency excusing the warrant requirement does not also excuse the requirement that probable cause exists for searching a home for evidence or suspects. (*People v. Ray* (1999) 21 Cal.4th 464, 471 [88 Cal.Rptr.2d 1, 981 P.2d 928].) In our view, the *objective* circumstances known to Officers Clouse and Carreira fell short of supplying them with probable cause to believe there was someone in the apartment who was either in danger or dangerous to them. (See *Brigham City, Utah v. Stuart* (2006) 547 U.S. ___ [164 L.Ed.2d 650, 126 S.Ct. 1943] ["An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively, justify [the] action,'* " some italics added].)

■ The Attorney General also contends that the initial entry was justifiable as a protective sweep under *Maryland v. Buie* (1990) 494 U.S. 325, 331 [108 L.Ed.2d 276, 110 S.Ct. 1093] (*Buie*). Again, we disagree. "The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." (*Id.* at p. 337.) "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." (*Id.* at p. 327.) "A protective sweep . . . occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him [or her] for a crime," and allows the arresting officers to take "steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." (*Id.* at p. 333.)

In *Celis*, our Supreme Court explained that unlike an entry based on exigent circumstances, "[a] protective sweep of a house for officer safety as described in *Buie*, *does not* require probable cause to believe there is someone posing a danger to the officers in the area to be swept. [Citation.] A *Buie* sweep is unlike warrantless entry into a house based on exigent circumstances (one of which concerns the risk of danger to police officers or others on the scene); such an entry into a home must be supported by *probable cause* to believe that a dangerous person will be found inside. [Citation.] A protective sweep can be justified merely by a *reasonable suspicion* that the area to be swept harbors a dangerous person." (*Celis, supra*, 33 Cal.4th at p. 678.)

The facts in *Celis* are instructive here. There, law enforcement officers were investigating a statewide drug trafficking ring they suspected of concealing and transporting drugs inside large truck tires. Their investigation led them to set up surveillance of a certain house. Because the defendant's car was parked outside that house, they traced its registration to defendant's house, and then put his house under surveillance, too. Over a two-day period, police followed the defendant as he made several round trips from his home, with a deflated tire and an air pressurizing tank, to a tire store and the Mexican border. When, on the second day, the defendant left his house through a back door rolling a large, inflated truck tire into an alley, and another man they had seen earlier drove into the alley in a full-size pickup truck, the police detained both men at gunpoint. Then, "[b]ecause [police] had noticed that defendant's wife and 'possibly a male juvenile' lived with him, [police] *entered the house to determine if there was anyone inside who might endanger their safety.*" (*Celis, supra*, 33 Cal.4th at p. 672, italics added.) They did not find anyone but, inside a box large enough to conceal a person, the police located several packages, which were subsequently found to contain large quantities of cocaine.

Deferring to the trial court's factual findings, but independently applying the requisite legal standard to the facts presented, the *Celis* court concluded that the warrantless search of the defendant's house could not be justified as a protective sweep. The court reasoned that the officer's testimony established the following facts: Over a two-day period, "officers had . . . conducted a surveillance of defendant's house on A Street in San Diego. During that time, the officers noted the presence of defendant's wife and 'possibly a male juvenile' in the home. But when on the afternoon of April 27th the officers entered defendant's house for a protective sweep just moments after detaining defendant in his backyard as he rolled a large truck tire toward Ordaz's waiting truck in the alley, they had no knowledge of the presence of anyone in defendant's house. As the trial court found, the officers 'had not been keeping track of who was in the house'; thus, when they entered the house to

conduct a protective sweep, they did so without 'any information as to whether anyone was inside the house.' Also, there is no indication that when stopped by the officers, either defendant or Ordaz was armed. Moreover, until defendant later consented to a search of the large truck tire he was rolling from the back door of his house toward the alley, the officers were unaware that the tire (like the similar tires found in the two Los Angeles County investigations . . .) had been cut open and then resealed to conceal cocaine. The facts known to the officers before they performed the protective sweep fell short of what *Buie* requires, that is, 'articulable facts' considered together with the rational inferences drawn from those facts, that would warrant a reasonably prudent officer to entertain a reasonable suspicion that the area to be swept harbors a person posing a danger to officer safety." (*Celis, supra,* 33 Cal.4th at pp. 679–680.)

The Attorney General does not argue that Detective Clouse's testimony (which was credited by the trial court) shows that he actually suspected that a person was inside apartment B, or that he had any grounds for suspecting as much, based on the facts presented by this particular arrest scene. On the contrary, Clouse conceded he could see there was no one in the living room or kitchen, although he could also see a closed inner door. The fact that the front door was open might have suggested there was someone inside, except that he knew Olson had some connection with the apartment, and Olson was standing 10 feet from the door. Furthermore, Clouse specifically testified, "I don't think that I thought there were people in the house, I was just trying to determine if there were people in the house." Finally, the record does not show that the police had reason to suspect Olson was armed (his wife said he kicked her) or that anyone else was involved in the domestic fracas, or that the fracas had occurred indoors (Olson's wife said the fight occurred outside and in the car). The police knew Olson's wife was away from the scene of Olson's arrest.

Instead, the Attorney General argues that "Clouse's testimony established that, based on his experience, he was concerned about his and Carreira's safety. This testimony, which was credited by the trial court, showed that Clouse had a reasonable suspicion that another person was in the apartment and this justified entry into [defendant's] apartment. *People v. Celis, supra,* 33 Cal.4th at p[ages] 679–680, does not require a different conclusion. *Celis* did not involve a situation where reasonable suspicion to enter a home existed. Moreover, in *Celis* the court made it clear that it was not making a ruling concerning entries into homes based on reasonable suspicion. Accordingly, *Celis* does not support [defendant's] claim."

■ Above, we have quoted liberally from the pages cited by the Attorney General. The lesson we draw from them is that when the police seek to justify the warrantless entry into a home as a protective sweep for the purpose of allaying officer safety concerns, the facts known to the police must rise to a reasonable suspicion that the area to be swept harbors an individual or individuals posing a danger to those on the arrest scene. (See also *Buie, supra*, 494 U.S. at p. 334.) Such facts were not shown in *Celis*, and they are not shown here. It does not appear to be enough, under *Celis*, that the police were genuinely apprehensive of danger based on past experience with domestic battery situations or large-scale drug operations.

We are aware that "case law recognizes that probable cause of ongoing spousal abuse at a residence warrants immediate police intervention." (*People v. Higgins* (1994) 26 Cal.App.4th 247, 252 [31 Cal.Rptr.2d 516].) Nor do we question that "frequently sympathetic parties other than the two combatants, such as family members, friends, parents, people that have an emotional stake in what's occurring . . . are not happy about the police being involved in their personal business and . . . also may want to protect the victim and/or suspect," as Detective Clouse testified. As the *Celis* court recognized, "[T]he work of a police officer in the field is often fraught with danger. At any given moment, a seemingly safe encounter or confrontation with a citizen can suddenly turn into an armed and deadly attack on the officer." (*Celis, supra*, 33 Cal.4th at p. 680.) Nevertheless, to say that the warrantless entry into defendant's home in this case was justified because of a police officer's past experiences with domestic violence arrests would be tantamount to creating a domestic violence exception to the warrant requirement. This we cannot do. (*Mincey v. Arizona, supra,* 437 U.S. at pp. 394–395 [no "murder scene" exception to the warrant requirement].)

"Society's interest in protecting police officers must . . . be balanced against the constitutionally protected interest of citizens to be free of unreasonable searches and seizures. In considering both interests, the United States Supreme Court has articulated certain legal rules, allowing, for instance, a warrantless entry into a home when exigent circumstances exist, or permitting a protective sweep of areas of a home where persons in hiding may pose a danger to officer safety." (*Celis, supra*, 33 Cal.4th at p. 680.) Without either probable cause or a reasonable suspicion to believe that there were potentially dangerous persons inside defendant's apartment, the entry into defendant's apartment violated the Fourth Amendment.

The Attorney General further argues that even if the initial entry was illegal, the evidence should not be suppressed, because the consents to search given by defendant and Myers were independent intervening acts which attenuated the taint of the illegal entry. (*People v. Gonzalez* (1998) 64

Cal.App.4th 432, 444 [75 Cal.Rptr.2d 272].) Given the totality of the circumstances here, we reject this argument, as did the trial court. In our view, the illegal entry inexorably led to the search and seizure of the contraband challenged here, and defendant's motion to suppress should have been granted.

## DISPOSITION

The judgment is reversed. On remand, the trial court is to set aside defendant's guilty plea, vacate the order denying defendant's motion to suppress evidence, and proceed on the motion in accordance with the views expressed in this opinion.

Elia, Acting P. J., and Mihara, J., concurred.

A petition for a rehearing was denied October 23, 2006, and on October 5, 2006, and October 23, 2006, the opinion was modified to read as printed above.