Filed 10/4/16  P. v. Williams CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# THIRD APPELLATE DISTRICT

## (Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C078391 |
| Plaintiff and Respondent, | (Super. Ct. No. 14F05453) |
| v. | |
| DAVID RAY WILLIAMS, | |
| Defendant and Appellant. | |

Following the denial of his motion to suppress evidence pursuant to Penal Code section 1538.5,[1] defendant David Ray Williams was tried and convicted by a jury of possession of a firearm and ammunition by a convicted felon (§§ 29800, subd. (a)(1), 30305, subd. (a)(1)).  The trial court found a prior conviction allegation true, and sentenced defendant to four years in state prison.

On appeal, defendant contends the trial court erred in denying his motion to suppress.  We disagree and shall affirm.

---

[1] Undesignated statutory references are to the Penal Code.

## FACTUAL BACKGROUND

The facts are drawn from the evidence presented at the hearing on defendant's motion to suppress. The sole witness, Sacramento Police Officer Christopher Shippen, testified as follows:

On August 6, 2014, Officer Shippen and other members of the Sacramento Police Department's regional postrelease community supervision (PRCS) team went to the home of defendant's brother, Donald Williams,[2] to conduct a routine supervision check on Donald, who was subject to postrelease supervision and search due to his prior conviction for petty theft with a prior. (§ 666.) Shippen testified he did not have any specific information that there was anything wrong at Donald's home or that Donald was a threat due to his prior conviction, but noted that "every contact that we make, there is concern of a weapon . . . ." He further testified that it was "more of a routine contact for us but, as part of my team, we have heightened awareness anyways" because two officers on his team had previously been involved in officer-involved shootings.

Officers arrived at Donald's home in marked and unmarked patrol vehicles, wearing police raid vests bearing the word "Police" and carrying badges on their belts. They first encountered defendant, defendant's father, and another man in the driveway. Defendant immediately yelled into the house something like, "the cops are here." Officer Shippen was concerned that defendant was yelling into the house to alert any occupants to the officers' presence. Some of the officers detained the three men in the driveway while other officers went into the house "to conduct a protective sweep and to contact whoever else was inside the house as part of [the officers'] normal process to be able to do [their] compliance search."

---

[2] Due to his sharing the same surname with defendant, we shall refer to Donald by his first name. No disrespect is intended.

2

When Officer Shippen entered the house, he noticed the front room was so cluttered with furniture and other items that it presented a "lot of geographical threats," or places a person could hide or be concealed so as not to be seen.

There were four bedrooms in the house, three on the north wall facing out towards the driveway and one on the southwest corner of the house, and two bathrooms. All but one of the doors inside the house was unlocked, enabling officers to quickly clear each of those rooms, including the kitchen where Donald and two other people were located. The only locked door led to the middle bedroom on the north wall facing the driveway. The bedroom door had a keyhole lock in the door handle so that it could be locked from either inside or outside the bedroom. The bedroom window, which faced the driveway, was open but the shades were drawn.

Officer Shippen did not hear any noises from the bedroom but believed someone was inside because the door was locked, possibly from the inside, and the open window was the closest point to where defendant had yelled his warning into the house. Shippen stood guard at the bedroom door to make sure no one entered or exited while another officer "retrieved" the key from defendant.[3] He then used the key to unlock the door and entered the bedroom to finish the protective sweep. Shippen scanned the room and immediately saw four shotgun shells in plain view on the dresser. He finished the protective sweep, determined no one was inside, and left the room. Having determined the bedroom belonged to defendant, he conducted a criminal background check and found defendant was a convicted felon prohibited from possessing ammunition.

Officer Shippen asked defendant for his consent to do a complete search of the bedroom. Defendant initially gave consent, but then revoked it when presented with a

---

[3] According to Officer Jason Start, defendant stated he "had a key to [the bedroom] on his person." However, it is not clear from the record whether defendant gave the key to Start willingly or it was taken from him by the officer.

written consent form.  Shippen obtained a search warrant and the bedroom was searched by another member of the PRCS team, Investigator Lee Gemetti, who seized the shotgun shells, as well as a Winchester shotgun with one round in the chamber, and a California benefits card in defendant's name.

Officer Shippen testified that, anytime he and other officers do this type of supervision check, "there's a heightened state just as routine officer safety."  When asked whether it was his normal procedure to clear all of the rooms in a house, whether locked or unlocked, Officer Shippen testified as follows:  "No . . . it's more of a case-by-case basis.  One example would be if we had surveillance on a residence and we end up seeing—say we know a defendant, like two people live there, both people leave, we are going to stop them away from the house, detain them and then go do a search.  [¶]  If we were to encounter a locked room in a house in that situation, as a hypothetical, and we didn't have a status or legal authority to be in that room, but we knew that definitively there was nobody in there, we would not enter that room to clear it.  [¶] . . . [¶]  If we had a locked room or a room that we couldn't gain access to, and we were a hundred percent certain that there was nobody inside that room, we would not do a protective sweep on that room.  [¶] . . . [¶] . . .  If it was an unknown threat, more middle of the road, where somebody could be in the room, somebody could not be in the room, sometimes, we would do a protective sweep and sweep that room, other times we would not.  Other times we would post somebody on that door and hold that depending on what the results of the rest of the sweep and the investigation were.  [¶]  If we had a concern that somebody was in that room, and we didn't have legal authority to be in there, but we were fairly confident that somebody was in that room, or had a high probability, not middle of the road, but a high probability, we would do a protective sweep there."

# PROCEDURAL HISTORY

Defendant was charged by amended complaint, deemed the information, with possession of a firearm by a convicted felon (§ 29800, subd. (a)(1)) and possession of ammunition by a convicted felon (§ 30305, subd. (a)(1)). The amended complaint alleged a prior conviction for assault with a deadly weapon, a strike. (§§ 667, subds. (b)-(i), 1170.12.)

Defendant filed a motion pursuant to section 1538.5 to suppress all evidence found during the search of his bedroom, including the shotgun and shotgun shells, arguing the police acted without a warrant and violated his reasonable expectation of privacy. The prosecution opposed the motion. Following a hearing, the trial court denied the motion, finding in relevant part as follows:

"So, I do think it does come down to . . . this. [¶] Is there articulable reasonable suspicion whether a prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest[] scene.

"And I'm certainly mindful of the caution by the U.S. Supreme Court, warning lower courts to avoid unrealistic 'second guessing' of police officers acting in a swiftly developing situation, that there is excellent reason to allow officers when going to conduct a search pursuant to search conditions to do a protective sweep. [¶] . . . [¶]

"One, the subject of the search, Donald Williams, was not one of three people out front. So, certainly there would be reason to believe that he may be inside the house.

"Secondly, [defendant] shouted into the house, presumably not just to the furniture.

"So I think it's reasonable for the officers to believe that others were inside the home. As the team goes into the home and certainly others are found in the kitchen area, but given there was no tally as to how many people might live at the home, then the

5

officer—the team still will not know how many people might be in that home at that given moment.

"They have three out front. They have at least two more inside the home, maybe if need be, even three more inside the home, been contacted, it's a four-bedroom home, not a one-bedroom apartment, so, it has the potential to have a lot of people living under the roof of that home, visiting that home.

"And so, then to the locked door. And the testimony is that that was the locked door, and it was associated with the opened window with the closed blinds, where [defendant] had said something. Certainly find that the officer while he could not recall the exact language, it was something that was along the lines of, 'the cops are here,' 'the police are here,' something like that, as opposed to, 'is dinner ready?'

"And, so, given he directed it toward that part of the house, which may have just been closest to him, again, it's the very room where the door is locked. And it is important that it's not a padlock sitting on the outside of the door, but a conventional doorknob. And certainly, it's not unreasonable for an officer to believe a doorknob can be locked on the outside, it could be locked on the inside as well.

"And really, I think the protective sweep in this circumstance, you are concerned about whether or not a person may be hidden in that room who may even, in fact, be armed. And that while then conducting the probation search of the rest of the home, whether that person might exit that room and confront one or more officers. Again, that's why we have this protective sweep doctrine is to prevent against that very scenario.

"So, I do think that I'm satisfied that Officer Shippen was able to articulate reasonable suspicion as to why it was that he went in to conduct a protective sweep. And certainly his actions, once in [defendant's] room, are exactly what the courts expect of the

6

officers; namely, and it's only to be a cursory inspection to dispel any reasonable suspicion there may be danger in there, and that's what the officer did.

"He looked in the room, didn't see anybody, he makes a mental note of ammunition sitting on the headboard shelf of the bed and then exits the room, and then does what I think the Fourth Amendment contemplates, and certainly this line of cases presumably would contemplate, he goes and gets—actually he's not able to get consent from [defendant], which certainly [defendant] was entitled not to give the consent, to get a search warrant by a magistrate, and that's what he did.

"So, to me, this feels very by the book. I don't see any sort of ulterior agenda going on here by the team going into that home other than to exercise Mr. Donald Williams's supervision terms. And then in doing so, to do a protective sweep to make sure that officers were going to be safe in conducting those search and seizure terms."

At the subsequent jury trial, Officer Shippen testified in a manner consistent with his testimony at the hearing on defendant's motion to suppress. The parties stipulated defendant had previously been convicted of a felony.

At the conclusion of trial, the jury found defendant guilty as charged. In a bifurcated proceeding, the trial court found true the prior strike allegation.

The court denied defendant's *Romero*[4] motion and sentenced him to an aggregate term of four years in state prison.

Defendant filed a timely notice of appeal.

---

[4] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

7

Defendant contends the totality of the circumstances did not give rise to a reasonable articulable suspicion of danger justifying the protective sweep and subsequent warrantless search of his bedroom. We disagree.

"The Fourth Amendment to the federal Constitution guarantees against unreasonable searches and seizures by law enforcement and other government officials." (*People v. Parson* (2008) 44 Cal.4th 332, 345.) " 'It is a "basic principle of Fourth Amendment law" that searches and seizures inside a home without a warrant are presumptively unreasonable.' " (*People v. Thompson* (2006) 38 Cal.4th 811, 817, quoting *Payton v. New York* (1980) 445 U.S. 573, 586 [63 L.Ed.2d 639].) When police conduct a search or seizure without a warrant, the prosecution has the burden of showing the officers' actions were justified by an exception to the warrant requirement. (*People v. Redd* (2010) 48 Cal.4th 691, 719; *People v. Camacho* (2000) 23 Cal.4th 824, 830; *People v. Chavez* (2008) 161 Cal.App.4th 1493, 1499.)

One recognized exception to the warrant requirement for searches and seizures is the " 'protective sweep' " exception. (*Maryland v. Buie* (1990) 494 U.S. 325, 327 [108 L.Ed.2d 276, 281] (*Buie*); *People v. Seaton* (2001) 26 Cal.4th 598, 632.) The Fourth Amendment permits a protective sweep if the searching officer " 'possesse[d] a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]" the officer in believing' [citation] that the area swept harbored an individual posing a danger to the officer or others." (*Buie, supra*, at p. 327; accord, *People v. Ormonde* (2006) 143 Cal.App.4th 282, 292 (*Ormonde*).) A protective sweep may not be based on "a mere 'inchoate and unparticularized suspicion or "hunch" ' . . . ." (*Buie,* at p. 332.) Officers conducting a protective sweep who see an item in plain view, which they have probable cause to believe is evidence of a crime or contraband, may lawfully seize it without a warrant.

8

(*Id.* at p. 330; *Arizona v. Hicks* (1987) 480 U.S. 321, 325-327 [94 L.Ed.2d 347, 354-355]; *People v. Clark* (1989) 212 Cal.App.3d 1233, 1238-1239.)

Under the reasonable suspicion standard, courts must evaluate the totality of circumstances on a case-by-case basis, allowing the officers on the scene to draw on their own experience and training to make inferences from and deductions about the cumulative information available to them. (*United States v. Arvizu* (2002) 534 U.S. 266, 273-274 [151 L.Ed.2d 740, 749-750] (*Arvizu*); *People v. Ledesma* (2003) 106 Cal.App.4th 857, 863 (*Ledesma*).)

"The standard of appellate review of a trial court's ruling on a motion to suppress is well settled. We view the record in the light most favorable to the trial court's ruling and defer to its findings of historical fact, whether express or implied, if they are supported by substantial evidence. We then decide for ourselves what legal principles are relevant, independently apply them to the historical facts, and determine as a matter of law whether there has been an unreasonable search and/or seizure." (*People v. Knight* (2004) 121 Cal.App.4th 1568, 1572; accord, *People v. Lenart* (2004) 32 Cal.4th 1107, 1119.)

Here, the protective sweep was justified and reasonable. When officers arrived at Donald's home, they encountered defendant and two other people in the driveway. Donald, the subject of the supervision check, was not among them, making it reasonable to suspect he was inside the house, potentially not alone. Defendant immediately hollered at the open window closest to him—the window to the locked bedroom— informing those inside the house something to the effect that "the cops are here." The window to the bedroom was open but closed blinds obstructed the view from outside. When officers entered the house, Donald and one or two other people were detained in the kitchen. However, given the fact that the house contained four bedrooms, and that defendant yelled toward the locked bedroom, it was reasonable to suspect that there could

9

be more people either living in or visiting the house. Officers were able to clear all but one room in the house—defendant's bedroom—the only room in the house with a locked door. As the trial court noted, the door was not locked by a padlock someone would have had to secure from outside the room; rather, it was locked by a key at the handle, which someone could have secured from the inside of the room after hearing defendant's warning and retreating into the room to hide or possibly arm themselves. Finally, Officer Shippen testified that, in his 14 years as a police officer, he "contacted people multiple times that had been hiding in silence where you did not hear them." Based on the totality of these facts and circumstances, it was reasonable to believe someone who might pose a threat to the officers could be inside the locked bedroom.

Defendant claims that, under the totality of the circumstances, police had nothing more than a hunch or a generalized suspicion that someone was inside the locked bedroom. For this proposition, he relies on three cases: *Buie*, *Ledesma*, and *Ormonde*. We discuss these cases and conclude defendant's claim lacks merit.

In *Buie*, the United States Supreme Court upheld a warrantless protective sweep where police had arrest warrants for two men, arrested one of them inside his home, and found evidence in plain view during a sweep of adjoining spaces from which an attack on police could be launched. (*Buie, supra*, 494 U.S. at p. 328.) Noting that a search incident to arrest in the home presents a risk of danger "as great as, if not greater than" an encounter on the street or roadside, the high court held that a protective sweep "may extend only to a cursory inspection of those spaces where a person may be found" and may last "no longer than is necessary to dispel the reasonable suspicion of danger . . . ." (*Id.* at pp. 333, 335-336.)

In *Ledesma,* the Court of Appeal extended *Buie* to probation searches. Officers went to a residence to conduct a probation search based on information that Cindy Barajas, a known drug user on searchable probation, lived there. (*Ledesma, supra*,

10

106 Cal.App.4th at pp. 860-861.) The defendant, who appeared to be under the influence of drugs, responded to the officers' knock and admitted them, but said Barajas had not been there in a while. (*Id.* at p. 861.) He escorted the officers to the bedroom Barajas used when she was at home. (*Ibid.*) Before searching that room, the officers asked the defendant whether anyone else was in the residence; he said no. (*Ibid.*) Officer Rosin, who had extensive training and experience in narcotics investigation (*id.* at p. 862), said he wanted to do a " 'security check for [the officers'] safety' to 'make sure nobody was going to sneak up behind [them] while [they] had [their] heads buried in a dresser drawer looking for items within [Barajas's] probation terms.' " (*Id.* at p. 861.) The defendant took the officers to his own bedroom. (*Ibid.*) As Officer Rosin looked around the bedroom, he saw the defendant walk up to a dresser in the room, grab what appeared to be bindles of methamphetamine, and slide them into the dresser drawer. (*Ibid.*) Observing a roll of money on the dresser top, Officer Rosin concluded that the defendant was selling controlled substances. (*Ibid.*) After the defendant admitted the substance in the drawer was " 'crank,' " he was arrested. (*Id.* at pp. 861-862.)

Affirming the trial court's denial of the defendant's motion to suppress evidence, the *Ledesma* appellate court observed: "Among the circumstances that are appropriately taken into account in evaluating a protective sweep are the type and location of the police action contemplated following the sweep. Here the officers were about to execute a valid probation search inside a house. *Buie, supra*, 494 U.S. 325, involved a protective sweep in the context of an arrest. Subsequent cases, however, have clarified that its holding is not limited to arrest situations. [Citations.] Furthermore, a respected treatise notes that when officers are rendering aid, they may conduct a protective sweep of the premises so long as the requirements of *Buie* are met. [Citation.] Thus, we conclude a security sweep may properly precede a probation search." (*Ledesma, supra*, 106 Cal.App.4th at p. 864, fn. omitted.)

"The officers' safety concerns were increased by the probable duration of the search [and] the fact that it would occur on their 'adversary's "turf" ' [citation] . . . . We reject the notion that a protective sweep is *always* justified prior to a search. However, a prudent officer will consider the safety concerns triggered by a search in determining the appropriateness of first conducting a sweep and a reviewing court must do the same." (*Ledesma*, *supra*, 106 Cal.App.4th at pp. 864-865.)

The *Ledesma* court also noted that "the type of criminal conduct underlying the arrest or search is significant in determining if a protective sweep is justified." (*Ledesma*, *supra*, 106 Cal.App.4th at p. 865.) There, the probation search was based on search and seizure conditions related to Barajas, a convicted drug user. The defendant, who Officer Rosin believed shared the home with Barajas, appeared to be under the influence of drugs. Thus, "it was reasonable to conclude that the residence was the site of ongoing narcotics activity," of which firearms are one of the " ' "tools of the trade." ' " (*Ibid*.) Additionally, "[i]n Rosin's opinion, based on his experience and training, drug users and those who associate with them are apt to have weapons in the house and have transients 'in and out of their house at all times of the day or night.' " (*Ibid*.) The court concluded the totality of circumstances justified the protective sweep. (*Id.* at pp. 863-868.)

In *Ormonde*, Detective Clouse responded to a domestic violence call. He first went to the location of the victim, and then was redirected to an apartment where the suspect was supposed to be. When Clouse arrived, he encountered the suspect, Olson, outside the open door of the apartment. Another officer detained Olson while Clouse entered the apartment. (*Ormonde*, *supra*, 143 Cal.App.4th at p. 287.) The detective did not ask Olson if there were people in the apartment, nor did he think there were people in the apartment. "He believed that his safety and the safety of the other officers would be jeopardized if he did not enter the house." (*Ibid*.) The defendant, his girlfriend, and a young girl came in through a back door. Clouse spoke with them outside, then sent the

12

woman and girl back inside. (*Ibid.*) At some point, Clouse received information that Olson was a methamphetamine user. The defendant gave Clouse permission to search the kitchen for items that might belong to Olson. Clouse found a small amount of burnt marijuana and a cut straw that looked as if it could have been used to ingest drugs. During the search, Clouse received information that defendant was a drug dealer and had drugs in his bedroom. After obtaining consent from the defendant's girlfriend to search the bedroom, and bluffing to the defendant that he knew about the drugs in the dresser, Clouse obtained permission from the defendant to go inside and get the drugs. The defendant told Clouse where the drugs were. Clouse had the defendant handcuffed for safety purposes and accompanied him back inside, where the defendant led Clouse to the drugs. (*Id.* at pp. 287-288.) The trial court denied the defendant's motion to suppress the evidence. (*Id.* at p. 285.)

The appellate court reversed. (*Ormonde*, *supra*, 143 Cal.App.4th at pp. 285, 296.) The court rejected the Attorney General's argument that the defendant's entry into the apartment was justified by exigent circumstances, noting Olson's arrest occurred outside, Clouse knew the victim (Olson's wife) was not inside, and Clouse admitted he did not think there were people (victims or suspects) in the apartment. The police did not know what Olson's connection was to the apartment, nor was there evidence any violence occurred inside. (*Id.* at pp. 291-292.) The court also rejected the Attorney General's argument that entry was justified by the protective sweep exception under *Buie* as supported by Clouse's testimony that, based on his experience, he was concerned for his safety and the safety of the other officers. The court noted that, "when the police seek to justify the warrantless entry into a home as a protective sweep for the purpose of allaying officer safety concerns, the facts known to the police must rise to a reasonable suspicion that the area to be swept harbors an individual or individuals posing a danger to those on the arrest scene," and concluded such facts had not been shown. (*Id.* at p. 295.) The

court further noted, "It does not appear to be enough, under [*People v. Celis* (2004) 33 Cal.4th 667], that the police were genuinely apprehensive of danger based on past experience with domestic battery situations or large-scale drug operations." (*Ibid*.)

Defendant argues the facts here are more like those in *Ormonde* and nothing like those in *Buie* or *Ledesma*. He further argues the locked bedroom door and defendant's act of yelling into the house established nothing more than a hunch that someone might be in the bedroom and were thus insufficient to establish a reasonable suspicion to support the warrantless search. The claims lack merit.

*Ormonde* is distinguishable. The detective in *Ormonde* was responding to a domestic violence call. By the time he reached the apartment, he already knew the victim was safely off the premises and the suspect was standing outside the apartment, leaving him no reason to enter the apartment or conduct a protective sweep. He nonetheless did so, relying on his generalized concern for officer safety. As the court concluded, an officer's past experience *alone* does not create reasonable suspicion justifying a protective sweep. (*Ormonde*, *supra*, 143 Cal.App.4th at p. 295.)

Here, like *Ledesma*, Officer Shippen went to the home to conduct a probation search based on information that Donald, on searchable probation for having been convicted of petty theft with a prior theft conviction, lived there. When Shippen and other officers arrived, they encountered defendant and two others in the driveway, but not Donald. Like *Ledesma*, the officers had reason to believe Donald, the subject of the probation search, was inside the house. While the facts here did not involve the narcotics activity, violence, and particularized concern regarding weapons presented in *Ledesma*, proper protective sweeps are not limited to investigation of particular crimes. (See *Arvizu*, *supra*, 534 U.S. at pp. 273-274.) The fact that, upon Shippen's arrival, defendant immediately hollered toward the open window into the house to warn the occupants in essence that police were present was sufficient to cause a reasonable officer

14

concern that defendant was warning those inside to allow them to hide and possibly arm themselves, thus justifying a protective sweep.

Defendant argues the fact that officers obtained the key to the bedroom from someone outside strongly suggests they knew the person who had locked the door was outside. We are not persuaded. As the People aptly note, the high court "has been sharply critical of lower court decisions precluding police reliance on facts consistent with an innocent as well as a guilty explanation." (*Ledesma*, *supra*, 106 Cal.App.4th at p. 863, citing *Arvizu*, *supra*, 534 U.S. at p. 274.)

Once inside the four-bedroom house, the totality of circumstances, including the presence of several more individuals and a number of geographic threats due to the significant amount of clutter, the fact that the only locked door was to the bedroom towards which defendant hollered his warning, and the fact that the bedroom door was able to be locked from the inside, coupled with Officer Shippen's past experience, was sufficient to provide reasonable, articulable suspicion to justify the protective sweep.

Defendant contends the search of his bedroom was improper because he took steps to protect his privacy by locking the door, and his bedroom was neither a common area nor an area under Donald's control and was therefore not subject to search based on Donald's probationary status. He cites a number of cases in support of his claim: See *People v. Robles* (2000) 23 Cal.4th 789, 800 (search of garage of residence not justified by circumstance that the defendant's brother, who lived in residence, was on probation and subject to search condition of which police were unaware at time of search), *People v. Sanders* (2003) 31 Cal.4th 318, 335 (Supreme Court struck down denial of motion to suppress evidence seized during search of residence of two people, one of whom was on parole and subject to search conditions of which police were unaware at time of search), and *In re Jaime P.* (2006) 40 Cal.4th 128, 130 (warrantless search of juvenile not justified where officer unaware of juvenile's probationary status at time of search); see also

15

*Minnesota v. Olson* (1990) 495 U.S. 91 [109 L.Ed.2d 85] (overnight guest had reasonable expectation of privacy in host's home), *People v. Stewart* (2003) 113 Cal.App.4th 242, 253 (houseguest had reasonable expectation of privacy in host's home), and *Beach v. Superior Court* (1970) 11 Cal.App.3d 1032, 1035 (denial of suppression motion reversed where the defendants' sister consented to search of house she shared with the defendants but her authority to consent to search only extended to areas of house she shared with the defendants and not to bedroom officers knew to be the defendants' bedroom).

None of the cases cited by defendant are instructive. *Robles*, *Sanders*, and *Jaime P.* addressed whether a search is justified where the police are unaware of either the defendant's or the search subject's probationary status, an issue not presented here, where the purpose of the visit was to conduct a routine supervision check on Donald, a known probationer/parolee. While *Olson* and *Stewart* established that houseguests have a reasonable expectation of privacy in the host's home, and *Beach* addressed the scope of consent given by a cohabitant, none of the cases speak to the issue before us, as identified by defendant: "whether the police were constitutionally permitted to conduct a *protective sweep* of [defendant's] bedroom." (Italics added.) That defendant had a limited expectation of privacy in his bedroom does not make that bedroom immune from entry. Where, as here, officers conducting a supervision check on a probationer have a reasonable, articulable suspicion someone might be hiding in a locked bedroom, the limited expectation of privacy of the person living with the probationer is subject to a "quick and limited search of premises . . . narrowly confined to a cursory visual inspection of those places in which a person might be hiding" to prevent an unexpected attack on and protect the safety of the officers. (*Buie, supra,* 494 U.S. at p. 327.) "The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete [the police action] and depart the premises." (*Id.* at pp. 335-336.) That is precisely what happened here. Officer Shippen

unlocked the door and entered defendant's bedroom, quickly scanned the room, happened to see the shotgun shells in plain view on the dresser, swept the rest of the room and, finding no one, left the room. After an unsuccessful attempt to obtain defendant's consent to search the room, Shippen properly obtained a warrant and law enforcement then conducted a full search of the bedroom.

As stated by the court in *Ledesma,* "It is beyond dispute that the officers could not have searched defendant's bedroom pursuant to [the probationer's] search clause, but would be permitted to enter it while conducting a valid protective sweep. . . . Though [a protective sweep] indisputably trenches into the privacy of nonprobationers, it does not eliminate their rights." (*Ledesma*, *supra*, 106 Cal.App.4th at p. 867.)

There is substantial evidence to support the trial court's finding that articulable facts, taken together with the rational inferences from those facts, supported a reasonable suspicion that the bedroom harbored an individual posing a danger to the officers.

We conclude the trial court did not err in denying defendant's motion to suppress.

**DISPOSITION**

The judgment is affirmed.

                                                            BUTZ            , J.

We concur:


      NICHOLSON      , Acting P. J.


      DUARTE         , J.


17