[No. D031986. Fourth Dist., Div. One. May 31, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES ANTHONY OLDHAM, Defendant and Appellant.

**COUNSEL**

Law Offices of Steven E. Feldman and Rebecca P. Jones for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Raquel Gonzalez,

4

Felicity Senoski and Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HUFFMAN, Acting P. J.**—In this case, we conclude that the trial court properly denied Charles Anthony Oldham's motion to suppress evidence under Penal Code[1] section 1538.5 brought on the ground his father Charles Oldham, Sr. (Father), could not consent to a search of the bedroom defendant occupied in the apartment they shared and that, consistent with the holding of *People v. Williams* (1999) 20 Cal.4th 119 [83 Cal.Rptr.2d 275, 973 P.2d 52] (*Williams*), Oldham cannot raise for the first time on appeal the issue of whether the police officers conducting the search had a good faith belief Father had the apparent authority to consent to a search of closed containers found in Oldham's bedroom. Accepting the People's concession discussed in part II, *post*, one of Oldham's convictions must be reversed. As we explain below, we accordingly affirm in part and reverse in part with directions.

### FACTUAL AND PROCEDURAL BACKGROUND

On September 19, 1997, about 6:17 p.m., San Diego County sheriff's deputies responded to a radio call of drug activity at an apartment in Vista, California. When they arrived, the deputies confronted Oldham outside of the apartment, where he consented to a search of his person, but refused to consent to a request to search the apartment for drugs. No drugs or contraband were found on his person.

While the deputies were there, Father stepped out of the apartment with Angela Parra, a friend of Oldham's. Deputy Albert Julian contacted Father, who indicated he lived there and it was his apartment, and who consented to a search of the entire apartment for drugs. Julian also gave Parra permission to reenter the apartment to get her purse before the deputies took her, Oldham and Father back into the apartment while they searched.

Deputy Robert Smith accompanied Julian to the master bedroom of the apartment, which Oldham claimed was his, to begin the search. Because he was concerned the deputies might plant some evidence in his room, Oldham sat on the bed to watch the deputies conduct the search. Smith first looked through the master bedroom's bathroom where he found on the floor 10 to 15 small pieces of plastic that he recognized as packaging material for methamphetamine (meth). He also found a propane torch behind the toilet and two glass smoking pipes in the medicine cabinet.

[1]All statutory references are to the Penal Code unless otherwise specified.

As Smith checked out a glass pipe and a small baggie containing some white residue found in a fanny pack that Oldham admitted was his and that was on a nightstand in the bedroom, Julian held up a large rock of meth he found in a blue eyeglass case on Oldham's dresser and exclaimed, "holy cow." Julian then placed handcuffs on Oldham before continuing the search. On the dresser Julian further found another eyeglass case with a small green plastic gram scale inside and a small case containing yet another glass smoking pipe and lighter. At some point, Oldham offered that the drugs were not his and that they must have belonged to Parra, who was at the apartment to visit Father.

After Oldham was arrested and taken to the police station, his pager activated five or six times during the booking process. Julian returned two of the calls with Oldham's permission. The man who answered the first re-turned call asked for "Charles." When Julian asked if he could help him because Charles was busy, the man asked for the "usual" and indicated such was "about $40 worth." The man who answered the second returned call also asked for Charles, stating he needed the "usual," but hung up when Julian asked him what was the "usual."

By information dated October 21, 1997, Oldham was charged with pos-session of meth for sale (Health & Saf. Code, § 11378), possession of meth (Health & Saf. Code, § 11377, subd. (a)), and possession of paraphernalia (Health & Saf. Code, § 11364). On February 4, 1998, Oldham filed a motion to suppress evidence found during the search of his bedroom and during booking, including the meth and the container in which it was found, the scale and the container in which it was found, three plastic baggies, one glass smoking pipe and lighter found on the dresser next to the scale, one glass pipe and baggy with residue found in the fanny pack, and one pager and any information obtained as a result of the seizure of the pager. In his moving papers and at the subsequent hearing, Oldham tried to show that the warrantless search of his bedroom and the subsequent seizure of the listed items sought to be suppressed were not reasonable or legal because Father's consent was limited to areas of the apartment that Oldham shared with Father. Oldham argued that because the master bedroom, its bathroom and the contents of both were solely within his control and Father had no possessory right or control over such rooms and their contents, the searching deputies could not have reasonably believed Father had authority to permit a search of those rooms and Oldham's personal property.

At the hearing, the prosecutor responded that Father had actual authority to consent to a search of the entire apartment, including Oldham's bedroom, and posited that, even if Oldham showed he had exclusive control of that

room thereby negating Father's authority to consent to a search of such area, Father had the apparent authority to consent, upon which the deputies reasonably relied. To support this justification, the prosecutor cited *People v. Daniels* (1971) 16 Cal.App.3d 36 [93 Cal.Rptr. 628] and presented Julian's testimony.

On direct, Julian stated that when he arrived at the apartment in response to the radio call, he contacted Father, told him why the deputies were there and asked him for consent to search his apartment for drugs or drug paraphernalia. Father replied, "Sure, go ahead." By that time, Father had told Julian that he paid the rent and that Oldham "has been coming and going" from the apartment for years. It was during the search of the back bedroom that Julian and Smith located "numerous types of drug paraphernalia and a fairly large amount of [meth]." Oldham, who sat on the bed while the deputies conducted the search, did not at any point tell the deputies to stop. When the deputies found the drugs, Oldham said the large amount of drugs and scale must have been put there by Parra, who came over to talk with Father. Father signed a written statement of consent after the deputies finished searching the apartment.[2]

On cross-examination, Julian indicated he had not talked with Oldham before obtaining consent to search from Father and that he was not aware whether any other deputy had done so. He noted he and another deputy went to the back bedroom merely as a place of origin to start their search and not because they suspected a specific person of the reported drug activity at the residence. Julian acknowledged Oldham had informed them he occupied the back bedroom and wished to be present during the search, but testified there was no other evidence that corroborated Oldham's statement that it was his bedroom and not Father's. Nevertheless, Julian believed Oldham and accepted that everything in the bedroom was "likely" his. Julian could not recall finding any items of dominion and control belonging to Father in the room.

In response to Julian's testimony, Oldham called Father to the stand. He remembered two sets of deputies coming to the apartment. They first questioned him about his knowledge of someone removing stereo speakers from a truck parked in the area and then about drug activity at the apartment. Father thought that two or three of the deputies had spoken with Oldham

---

[2]The defense stipulated that the following consent was executed after the search: "I, [Father], authorized . . . Deputy Julian of the San Diego County Sheriff's Department to search the residence at 156 Pond Place, apartment 20. I have lived at this residence since March of 1979 and am the sole tenant. I consented to a search of the entire apartment, including all rooms."

before talking with him. Because the door to the apartment was open, Father believed he heard Oldham refuse one deputy's request to search his room.

Father explained he had lived at the apartment complex since March 1979 and was presently its manager, receiving rent-free use of the apartment as compensation plus some cash for his responsibilities there. Oldham had lived with him since 1980 or 1981, and had occupied the master bedroom suite with an attached bathroom for the past five or six years. Father was not sure where "this coming and going came from[,]" since Oldham lived there on a permanent basis. Oldham sometimes helped Father with expenses when he had a "good paycheck" and would often mow the lawns around the complex. Periodically, Oldham would assist him in getting an apartment ready for a new tenant. Father, however, was not dependent on Oldham's occasional contributions to the household.

With respect to the use of the two bedrooms in the apartment, Father testified he did not regularly go into Oldham's room and Oldham did not regularly come into his room; rather, they respected each other's privacy. Father had never checked Oldham's room for drugs. He told the deputies to "go ahead" and search the whole apartment after he thought Oldham had told them "no[,]" because he did not know "of anything that would cause any problems." Father conceded he could not be positive the officers had asked for Oldham's consent to search the apartment because he was hard of hearing and had only heard Oldham say, "No, you can't," without knowing exactly what the question was before such statement. When Father gave his consent to search the entire apartment in front of Oldham, Oldham had not objected.

Father also acknowledged he had never told Oldham he could not come into his bedroom and vice versa. Although Father "[h]ardly ever" went into Oldham's room, he would sometimes do so to go back to the bathroom "to borrow some cologne or something." He and Oldham had not discussed any specific details about going into each other's rooms. Father only prevented his own guests from going into Oldham's room. Parra had been Oldham's guest the day of the search and had been in his room. After Oldham's arrest, Father told him he could not come back to the apartment to live.

The trial judge denied the motion to suppress, stating it was doing so based partially on *People v. Daniels, supra,* 16 Cal.App.3d 36 and, because: "The evidence here to me just is absolutely clear that the father had the authority or at the very least had the apparent authority which the officer could rely on to grant the search of the premises. [¶] The fact that he excluded the son from the home after this incident occurred tells me his

authority over the premises is superior to the son's. [¶] The fact they had some arrangement because the son helped him out, I think that's fine and that's probably what he should have done, amounts to control over the premises, and there's no evidence of any agreement of exclusivity of a single bedroom in a two-bedroom premises. [¶] It doesn't sound as if there's any agreement as to the guests coming and going. Maybe they did come and go, but there was no arrangement that prohibited it, nothing to prohibit the parties from going in each other's bedroom, but at this point the father made it clear the son was to be out of the house. I just don't have any problem with this one. [¶] The motion is denied."

The matter proceeded to trial, with Julian and Smith testifying consistently with the above evidence. Julian further noted that no cash or "pay and owe" sheets typical in drug sales were found in Oldham's bedroom. In addition, the prosecution presented a law enforcement expert who testified about the various quantities of meth for typical possession and the sale of meth. He opined the $1,150 worth of meth found in Oldham's room was possessed for purposes of selling. Father testified for both the prosecution and the defense, and an investigator with the public defender's office also testified for the defense. Oldham's defense theory was that Parra, as part of a conspiracy, planted the drugs in his room shortly before the deputies entered the apartment to search. The jury found otherwise.

The trial court subsequently suspended imposition of sentence on the count 1 possession for sale conviction, stayed the count 2 conviction for possession pursuant to section 654, and granted Oldham probation conditioned upon, among other things, serving 210 days in local custody. The court denied probation for the count 3 misdemeanor conviction and committed Oldham to 24 days of local custody with credit for time served, to run concurrently to the local time for count 1. Oldham timely appealed.

DISCUSSION

I

*Section 1538.5 Motion*

On appeal, Oldham initially contended the trial court erred in denying his section 1538.5 motion to suppress because Father could not give effective consent to search his bedroom and the containers therein because the room was not mutually used by both. Oldham further argued that even if his father had the authority to consent to a search of his room, that consent could not be used to permit a search of his privately owned and used containers in that

room. Moreover, although conceding that a search will be held reasonable where the police reasonably rely upon a third party's apparent authority to consent, Oldham asserts there was nothing about the circumstances surrounding the search in this case that could have given the deputies a good faith reason to believe Father's consent overrode Oldham's refusal to search his room and its contents.

While reviewing the record and the briefs in light of these contentions, we noted that although Oldham raised the issue of Father's authority to generally search his bedroom and its contents below, he had not raised the specific issue concerning the validity of Father's consent to search closed containers in that room. We, therefore, requested the parties submit supplemental briefing on whether the closed container issue was properly before us in light of the holding in *Williams, supra,* 20 Cal.4th 119. Having received and considered such supplemental letter briefs and authorities, we conclude that the trial court properly denied Oldham's motion to suppress the evidence in this case and that the specific closed container issue is not proper for appellate review.

A.   *Review of the Motion Below:*

■   When we review a trial court's ruling on a motion to suppress evidence under section 1538.5, we apply the substantial evidence test to the factual determination made by the court. We do not substitute our judgment for the credibility determinations of the trial court. Once the facts are established, however, we review such facts de novo to determine whether such facts justify the actions of the law enforcement officer. (*People v. Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961]; *People v. Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].)

■   With regard to a warrantless search of property, it is well settled that such is reasonable under the Fourth Amendment where proper consent is given. (*Illinois v. Rodriguez* (1990) 497 U.S. 177, 181 [110 S.Ct. 2793, 2797-2798, 111 L.Ed.2d 148].) Where the subject property is a premises occupied by more than one person, a search will be reasonable if consent is given by one of the joint occupants "who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." (*United States v. Matlock* (1974) 415 U.S. 164, 171 [94 S.Ct. 988, 993, 39 L.Ed.2d 242]; *People v. Ingle* (1960) 53 Cal.2d 407, 416 [2 Cal.Rptr. 14, 348 P.2d 577]; see also *People v. Bishop* (1996) 44 Cal.App.4th 220, 236 [51 Cal.Rptr.2d 629] [co-occupants who have joint access or control to property assume the risk police may be permitted to search by one such co-occupant sharing the property].) This is so, even where the

defendant has not consented to the search. (*United States v. Matlock, supra,* 415 U.S. at p. 171 [94 S.Ct. at p. 993].) Further, even if the consenting cotenant, in fact, lacks authority, officers may rely on his or her apparent authority. (*Illinois v. Rodriguez, supra,* 497 U.S. 177, 185-189 [111 S.Ct. 2793, 2799-2802]; *People v. Smith* (1966) 63 Cal.2d 779, 799 [48 Cal.Rptr. 382, 409 P.2d 222].

In *People v. Daniels, supra,* 16 Cal.App.3d 36, which was cited by the prosecutor and partially relied upon by the trial court in this case to deny Oldham's section 1538.5 motion, the defendant's mother had consented to a search of the room in her house in which the defendant stayed rent-free. (16 Cal.App.3d at p. 42.) In upholding the trial court's denial of the son's motion to suppress evidence found in a search of his room, this court found on appeal that based on the mother's ownership of the house and the lack of showing that the son had exclusive control over the room he was permitted to use, "the officers reasonably and in good faith believed defendant's mother had authority to consent to the search of the bedroom occupied by him; and, under these circumstances, the search was reasonable. [Citations.]" (*Id.* at p. 44.)

■ Applying the appropriate standard to the motion as brought before the court below, we conclude the trial court properly found that the prosecution had shown Father had authority to consent to a search of the entire apartment for drugs and drug paraphernalia, that he also had the apparent authority to consent to a search of the room Oldham occupied for such contraband, that Father exercised his authority to consent and that the deputies reasonably relied upon such consent. The facts presented at the hearing on the motion showed Deputy Julian had contacted Father, who explained that it was his apartment, that Oldham had lived there off and on for years without paying rent and that Oldham did not object to the actual search of the room in which he stayed after Father gave consent to search the entire apartment for drugs. The trial court found, and the evidence supports, that there was nothing to show Oldham had exclusive control over the bedroom he used or its contents. At most, the evidence showed there was joint control and Father possessed superior control because he had the right to exclude Oldham from the apartment and did so after Oldham's arrest. We therefore conclude it was reasonable for the deputies conducting the search for drugs to rely on Father's apparent authority to consent to the search of all the rooms in the apartment and their contents.

■ Nevertheless, Oldham argues for the first time on appeal that such consent was invalid to search the closed containers found on his bedroom dresser and the backpack found on a nightstand in that room. Relying on portions of *People v. Daniels, supra,* 16 Cal.App.3d 36 and others regarding

closed or locked containers that are identified as being within the sole or exclusive control of the defendant in the respective case, Oldham asserts the evidence cannot support a conclusion the deputies in good faith, although mistakenly, reasonably believed Father had control to authorize a search of the backpack and closed containers found in his room. (*Id.* at p. 42 [no right of mother to consent to search of son's closed suitcase]; see also *In re Scott K.* (1979) 24 Cal.3d 395, 404-405 [155 Cal.Rptr. 671, 595 P.2d 105] [no right of parent to consent to locked toolbox of minor son living at home]; *Beach v. Superior Court* (1970) 11 Cal.App.3d 1032, 1035 [90 Cal.Rptr. 200] [no right of sister to consent to search of bedroom she did not share with her brothers and their friend].)

Although we agree with Oldham that where the People rely on the consent exception to justify the reasonableness of a search, it is the People's burden to show that such consent was freely, voluntarily and knowingly given (*People v. Harwood* (1977) 74 Cal.App.3d 460, 466 [141 Cal.Rptr. 519]), and that it is also the People's burden to show the warrantless search was within the scope of the consent given (*ibid.*), such burden is irrelevant to the question of whether the lack of specificity in raising a particular issue on a suppression motion below will preclude the right to raise that issue on appeal. (*Williams, supra,* 20 Cal.4th at pp. 128-129.) We thus turn to our Supreme Court's recent resolution of this question for guidance in this case.

B.  *The Williams Case:*

In *Williams, supra,* 20 Cal.4th 119, our Supreme Court, after reviewing the substantive law regarding a defendant's Fourth Amendment rights against unreasonable searches and seizures and the vehicle inventory exception to the search warrant requirement of the Fourth Amendment (20 Cal.4th at pp. 125-127), explored the procedural requirements of properly presenting a section 1538.5 motion to suppress evidence obtained as a result of a search or seizure. (20 Cal.4th at pp. 127-136.) The court in *Williams* held that: "[W]hen defendants move to suppress evidence, they must set forth the factual and legal bases for the motion, but they satisfy that obligation, at least in the first instance, by making a prima facie showing that the police acted without a warrant. The prosecution then has the burden of proving some justification for the warrantless search or seizure, after which, defendants can respond by pointing out any inadequacies in that justification. [Citation.] Defendants who do not give the prosecution sufficient notice of these inadequacies cannot raise the issue on appeal. '[T]he scope of issues upon review must be limited to those raised during argument. . . . This is an elemental matter of fairness in giving each of the parties an opportunity adequately to litigate the facts and inferences relating to the adverse party's contentions.' [Citation.]" (*Id.* at p. 136.)

In so holding, the court in *Williams, supra*, 20 Cal.4th 119, concluded that as with any other motion, defendants making a section 1538.5 motion "must specify the precise grounds for suppression of the evidence in question, and, where a warrantless search or seizure is the basis for the motion, this burden includes specifying the inadequacy of any justifications for the search or seizure." (20 Cal.4th at p. 130.) The court clarified that the degree of specificity necessary in any particular case "will depend on the legal issue the defendant is raising and the surrounding circumstances[,]" and "need only be specific enough to give the prosecution and the court reasonable notice." (*Id.* at pp. 130-131.) The court in *Williams* cautioned, however, that defendants "cannot . . . lay a trap for the prosecution by remaining completely silent until the appeal about issues the prosecution may have overlooked." (*Id.* at p. 131.) After reviewing the Court of Appeal decisions on the subject, it noted that the "determinative inquiry in all cases is whether the party opposing the motion had fair notice of the moving party's argument and fair opportunity to present responsive evidence." (*Id.* at p. 135.)

With such principles in mind, the court in *Williams, supra*, 20 Cal.4th 119 turned to the facts of that case, which revealed Williams had moved to suppress evidence that police found in closed leather bags seized during an inventory search of the trunk of his car. (*Id.* at p. 136.) The court noted that Williams had anticipated the prosecution's justification for the warrantless search in that case by arguing in his moving papers that the police had no set inventory search policy. (*Ibid.*) The court found nothing wrong in such shortened procedure, but cautioned that where the defendant does so, "the prosecution should avoid the 'trap' of simply responding to the defendant's arguments and then resting. [Citation.]" (*Id.* at p. 136.) Because the prosecution in *Williams* merely argued the officers conducted an inventory of the truck after a lawful arrest, but did not show that there was a written policy or procedure for conducting such inventory search even when faced with moving papers that alleged there was no such policy, the Supreme Court found there was adequate notice given to the prosecution "that it had to prove a policy specifically governing the opening of closed containers." (*Id.* at p. 137.) The court reasoned that the express reference to "policy" by the defendant and his citing of United States Supreme Court precedent concerning inventory searches which required some written policy or "standardized criteria" governing the opening of closed containers was sufficient to apprise the prosecution "it would have to prove not just any policy, but, more specifically, a policy governing [the officer's] decision to open the leather bags." (*Ibid.*)

The court in *Williams, supra*, 20 Cal.4th 119 did not find it significant that defense counsel did not specifically mention a policy governing the opening

of closed containers at the time of the argument in that case because he had already referred to the inadequacy of the inventory search, and under established case law the prosecution is required to prove the existence of a policy supporting any inventory search. (*Id.* at pp. 137-138.) It further noted that because the trial court had "abruptly interrupted defense counsel's argument in order to make its ruling" on the motion, there was no way to determine whether defense counsel might have made mention of the closed bags if he had been allowed to continue with his argument. (*Id.* at p. 138.)

In addition, the court found the facts of *Williams, supra,* 20 Cal.4th 119 a prime example of the police using an inventory search as " 'a ruse for a general rummaging,' " rather than a valid inventory search which adhered to a preexisting policy or practice because the officers had stopped taking the inventory after they found drugs in the closed leather bags in the trunk. (*Id.* at p. 138.) Based on all of the above circumstances and the law concerning inventory searches, the Supreme Court found the prosecution had not met its burden of showing the inventory search in *Williams* was conducted pursuant to a preexisting policy and that "[t]he Court of Appeal [had] erred when it concluded that defendant had waived the issue of whether the opening of the leather bags was pursuant to a policy or practice." (*Id.* at pp. 138-139.)

C.  *Application of Williams to This Case*:

Oldham asserts his case cannot be distinguished from the facts presented in *Williams, supra,* 20 Cal.4th 119. He claims that similar to the defendant in *Williams,* he anticipated the prosecution's theory of justification that the search was proper pursuant to Father's consent and filed his moving papers, alleging a Fourth Amendment violation based on a warrantless search without valid consent. Besides identifying that he was seeking to suppress several items found in containers and the containers themselves, in his papers he also raised the issue of third party consent, citing a United States Supreme Court and a California case dealing with the issue of such consent regarding premises and personal property or effects. (See *United States v. Matlock, supra,* 415 U.S. 164; *Beach v. Superior Court, supra,* 11 Cal.App.3d 1032.) Although the prosecution did not present any justification for the search of closed containers, Oldham notes that several of the cases in its responsive motion papers and oral argument refer to both general consent to search premises and effects and the further search of closed or locked containers. (See *In re Scott K., supra,* 24 Cal.3d at p. 404; *People v. Daniels, supra,* 16 Cal.App.3d at p. 45.) Because the United States Supreme Court has held that consent to search even with a warrant is limited by the scope of that consent or the scope of the authority to consent (*Florida v. Jimeno* (1991) 500 U.S. 248, 251 [111 S.Ct. 1801, 1803-1804, 114 L.Ed.2d 297]),

Oldham argues that any challenge of a consent search necessarily encompasses a challenge to the scope of the consent, including the issue of the consent to search closed containers. He therefore asks this court to find, similar to the conclusion in *Williams, supra*, 20 Cal.4th 119, that his failure to mention in his moving papers or argument that the consent was inadequate regarding the containers in which most of the contraband was found was not significant and that the prosecution was on notice from the beginning that it needed to justify the search of such closed containers, thereby placing the issue properly before this court on appeal.

The People on the other hand read *Williams, supra*, 20 Cal.4th 119 to preclude us from addressing the precise issue of whether the search of the closed containers in this case was within the scope of the consent given. Having thoroughly reviewed the record in light of *Williams*, we agree with the People the present case is distinguishable from *Williams* and decline to relax the degree of specificity required by *Williams* to raise the closed container issue in this case.[3]

Here, the thrust of Oldham's motion to suppress was that Father could not consent to a search of the apartment after he (Oldham) had refused to consent to such search and that even if Father had authority to consent to a search of areas in the apartment he shared with Oldham, such consent did not include the master bedroom suite. As noted above, the prosecution presented evidence to show Father had at least the apparent authority to consent to a search of the entire apartment, including the bedroom which Oldham used. The evidence also showed Oldham did not have exclusive control over that room and its contents. Although Oldham's papers and argument identified items found in containers in the search of the master bedroom, he did not raise any distinct legal theory as to why the search of any of the closed containers was unreasonable. Nor did he claim sole ownership of any of the items searched until trial, at which time he only claimed sole ownership of the backpack. Without such claim or without pointing out any inadequacies in the prosecution's justification for Father's consent to search the specific items found in the master bedroom suite, neither the prosecutor nor the court was put on notice that additional justification for the scope of the search into any particular item was required.

---

[3]In the recent death penalty case, *People v. Jenkins* (2000) 22 Cal.4th 900 [95 Cal.Rptr.2d 377, 997 P.2d 1044] (*Jenkins*), our Supreme Court addressed an issue of third party consent regarding an unlocked briefcase belonging to the defendant which was found in a search of his sister's apartment. Although *Jenkins* does not deal with the *Williams* waiver issue (*Williams, supra,* 20 Cal.4th 119) in reaching the merits there, the court stressed that the majority of courts and commentators have concluded that the scope of consent usually includes the object or container searched unless specifically limited by the defendant. (*Jenkins, supra,* 22 Cal.4th 900, 973-976.)

This is the silence regarding issues about which *Williams* has cautioned. (*Williams, supra*, 20 Cal.4th at p. 131.)

Although many of the third party cases cited by Oldham did require further showing by the prosecution for a consent search of closed containers, none of those cases dealt with the question identified in *Williams, supra*, 20 Cal.4th 119, regarding the necessary specificity to satisfy the burden of raising an issue on a motion to suppress evidence in order to preserve it for appeal, which we address here. While Oldham raised issues by taking a shortened procedure similar to that taken by the defendant in *Williams*, after the prosecution had presented its opposition and evidence, Oldham did not raise any further specific objections or argument pointing out deficiencies in the prosecution's justification. Thus unlike in *Williams*, Oldham's counsel's argument was not "abruptly interrupted" thereby precluding him from possibly mentioning the closed containers issue he seeks to raise now. (*Id.* at p. 138.)

Moreover, contrary to the finding in *Williams, supra*, 20 Cal.4th 119, the facts of this case do not show that there was any ruse or pretext used to obtain the consent to search the apartment here. (*Id.* at p. 138.) Rather, the deputies clearly apprised Father that the search of the apartment would be for drugs and drug paraphernalia and that is what the deputies looked for during their search. The deputies also did not stop searching when they found such contraband in Oldham's room. They searched the entire apartment. Thus, based on the law regarding third party consent and the surrounding circumstances presented at the time of the motion, we cannot find that Oldham provided sufficient specificity in his motion of his closed container challenge to Father's consent brought for the first time on appeal. Because the prosecution did not have fair notice of such issue below or the opportunity to present responsive evidence to such challenge, leaving the matter unaddressed and unanalyzed, Oldham cannot now raise it.

Even if we were to consider such issue at this time, we would find any error in the trial court's ruling on the suppression motion harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The facts show that Oldham did not seek to suppress a propane torch and two glass smoking pipes found in the bathroom of the master bedroom and denied any connection to the drugs and paraphernalia found in the containers on the dresser in his room, telling the searching deputies that the items must have belonged to Parra, who had come to the apartment to visit Father. Nor did Oldham claim any ownership of the containers in which the contraband was found. In fact, at trial he attempted to portray the glass cases and other small container as belonging to a woman, not to a man. Because Oldham disclaimed ownership of the closed containers in which the drugs were found, search of those

containers was within the scope of consent given by Father to search the bedroom. Only at trial was it also discovered that at the time of the search, Oldham had identified the backpack as his before Deputy Smith searched it. Even though Oldham had not objected at that time to such search, arguably Father's consent was not sufficient to permit Smith to look into the backpack without further inquiry into ownership, and the pipe and baggie with residue found inside should have been suppressed. (See *In re Scott K., supra,* 24 Cal.3d at p. 404; *People v. Daniels, supra,* 16 Cal.App.3d at p. 45.) The suppression of such items, however, would not have affected the remainder of the motion which was properly denied under the facts of this case. Therefore, it is not reasonably probable a result more favorable to Oldham would have been reached if the items in the backpack had not been admitted into evidence.

## II

### *Vacating Count 2 Lesser Included Offense*

The People properly concede that Oldham's count 2 conviction for simple possession of meth must be vacated or reversed because it is necessarily included in the greater offense of possessing the same substance for sale based on the same evidence. (*People v. Pearson* (1986) 42 Cal.3d 351, 355 [228 Cal.Rptr. 509, 721 P.2d 595]; *People v. Magana* (1990) 218 Cal.App.3d 951, 954 [267 Cal.Rptr. 414].)

### DISPOSITION

The count 2 conviction for possession of meth is reversed. The trial court is directed to prepare a new order granting probation reflecting such reversal. In all other respects, the judgment is affirmed.

Haller, J., and McDonald, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 27, 2000. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.