Filed 2/2/24  P. v. Meneses CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. JESSE DANILO MENESES, Defendant and Appellant. | D081553 (Super. Ct. No. RIF2100963) |

APPEAL from a judgment of the Superior Court of Riverside County, Matthew C. Perantoni, Judge.  Affirmed.

Robert F. Somers, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance Winters and Charles C. Ragland, Assistant Attorneys General, A. Natasha Cortina, Christine Bergman and Arlyn Escalante, Deputy Attorneys General for Plaintiff and Respondent.

Following a bench trial, Jesse Danilo Meneses was convicted of assault against peace officers (Pen. Code,[1] § 245, subd. (c); counts 2, 3, 5, and 6),

---

1      Undesignated statutory references are to the Penal Code.

making criminal threats (§ 422, subd. (a); counts 8, 9), and attempting to deter, prevent, and resist officers from performing their duties (§ 69, subd. (a); counts 11-16).[2] The court sentenced Meneses to a suspended six-year eight-month prison term, consisting of a four-year midterm on count 2, and one-third the midterms on the other counts: a consecutive 16-month term on count 3, concurrent 16-month terms on counts 5 and 6, a consecutive eight-month term on count 8, a concurrent eight-month term on count 9, a consecutive eight-month term on count 11, and concurrent eight-month terms on counts 12 through 16. The court placed Meneses on probation for 24 months.

Meneses contends insufficient evidence supports his convictions for criminal threats and assault against peace officers, in part because the deputies were assertedly not lawfully performing their duties, his arrest was unlawful, and one officer was not present during his pursuit and apprehension. He further contends the trial court erred by denying his motion to suppress evidence from his assertedly illegal detention and arrest. We reject the contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Events of March 6, 2021*

In March 2021, Meneses became angry and aggressive after one of his stepsisters, M.R., removed a copy of a news article about another family member's death that Meneses had posted on a wall of the house in which they all lived. The incident resulted in his other stepsister, K.R., making a

---

[2] The court found Meneses not guilty of an attempted murder charge (§§ 664, subd (e), 187, subd. (a); count 1) and a charged criminal threat in count 10 against his mother. The People had earlier dismissed another assault charge in count 4 against one officer, Deputy Jardinas, and a criminal threat charge in count 7.

2

911 call to police. Multiple sheriff's deputies and a sergeant responded to the call. As captured by responding officers' body-worn cameras, M.R., K.R. and Meneses's mother all related that Meneses said he was going to burn the house down. M.R. told officers Meneses also said he would "kill everybody" and "kill the cops [¶] . . . [¶] . . . if they came." She said Meneses "was threatening to burn the house down. He was threatening to kill the cops if they came. He was threatening our family." M.R. told one deputy that K.R. called police and they locked themselves in a room with their dog "because we knew that if he got in, he would probably, I don't know, try to do something." M.R. and K.R.'s brother, S.R., described to officers how he intervened between M.R. and Meneses during the incident. He told a deputy that M.R. was "shaking, crying, and trembling," then "started throwing up" once Meneses had returned to his room after the altercation.

K.R. told an officer "we've all been feeling unsafe" because they had seen Meneses multiple times in the past starting fires outside and letting them burn while he walked away. M.R. also agreed that Meneses had "habits or behaviors of lighting fires" and another family member agreed he engaged in that behavior "[j]ust recently." K.R. said they did not feel safe at the house with him living there. She told officers that "we see him, like, making a spear, and he'll bring it up and he'll look very angry like and so we feel like he's just going to hurt us, um, like in the middle of the night, um, so we're scared." In the past, Meneses had threatened to kill K.R. with a large pocket knife, leading family members to lock K.R. in a bathroom.

After deputies arrived at the scene, some of them attempted to speak with Meneses from the bottom of a stairwell at the entryway. Meneses was at the top of the stairwell on a landing. He was agitated and yelling profanities, holding a tall, sharpened stick. Meneses at one point threatened

3

to slash his own neck and kill himself rather than submit to police. Some of the other family members were in upstairs bedrooms next to the stairway, and the supervising sergeant became concerned for their safety. Another deputy considered the stick a deadly weapon.

When officers finally got upstairs to Meneses, he threw a 40-ounce glass beer bottle at them, missing them, and swung at two officers with his knife. Meneses was ultimately detained and handcuffed. After he was taken away, one of the deputies discovered a cut in his shirt near his abdomen; the knife had cut through to the Kevlar in his body armor vest.

*Trial Testimony*

At trial, K.R. testified that when she told police what Meneses had said about burning the house down, she was in fear for her safety. But she also testified that she did not personally hear Meneses's threat, she only heard about it through M.R.

M.R. likewise testified at trial that based on Meneses's anger that night, she was worried about her family and her own safety. She admitted that Meneses never specifically threatened her that night. She could not recall exactly what she told police Meneses said, but said she was "probably not" exaggerating. She acknowledged telling police Meneses said he was going to kill family members, but could not remember it at trial.

S.R. testified that he made an audio recording of Meneses's statement about burning the house down. Apparently speaking of M.R., he agreed she was in fear that night. He testified he heard Meneses make his statement that he was going to burn the house down from a baby monitor; he did not actually see Meneses make the statement. S.R. was alone in the room when he heard it, and Meneses was alone at the time he said it. According to S.R.,

4

M.R. did not hear Meneses's statement; he was the only one. But he told the other family members about it.

One of the sheriff's deputies who responded that night, Deputy Eric Garcia, testified that when he first walked in the house, he was told Meneses was aggressive, fighting with one family member, and said he was going to light the house on fire. Upon immediately encountering Meneses, he saw him as hostile and carrying a weapon. Deputy Garcia testified that when he was informed that Meneses had threatened to burn the house down and kill family members, he believed Meneses had committed a criminal threat. He interpreted Meneses's statements to officers as telling them if they went upstairs, he would hurt them. Deputy Garcia observed the family members in apparent fear. That circumstance, combined with Meneses's possession of a weapon and his statements to officers, led the deputy to conclude it was not safe to proceed without detaining Meneses.[3] Because he and other deputies determined the potential for imminent danger, they formulated a plan to

---

[3] Deputy Garcia specifically testified that the officers had established a crime before making their plan to arrest Meneses: "*Now that we established a crime in that there was some imminent danger that he had a potential to do,* we had to figure out a safe tactical plan to try to apprehend him to remove him from the house. And I when say safe, safe for myself, my partners, the family, him so he didn't potentially burn this house down hurting or killing anybody." (Italics added.) He explained he knew there might be a struggle and wanted to peacefully detain Meneses, so "[t]hat is why we took so long talking to him trying to figure out, you know, what we can do to peacefully get him down stairs." It was after this point that the deputy said he called his corporal and sergeant.

enter an upstairs room from the outside so as to detain Meneses quickly and safely.[4]

DISCUSSION

I. <i>Substantial Evidence Standard of Review</i>

"In the context of a criminal case, the substantial evidence standard stems from the requirement that a criminal conviction necessitates 'proof beyond a reasonable doubt of every fact necessary to constitute the crime . . . .' " (<i>People v. Mumin</i> (2023) 15 Cal.5th 176, 198.)  Under this standard, "an appellate court retrospectively inquires whether a rational trier of fact <i>could have</i> found the defendant guilty beyond a reasonable doubt, based on all the evidence when viewed in the light most favorable to the prosecution.  'Sufficiency review essentially addresses whether "the government's case was so lacking that it should not have even been submitted to the jury." ' " (<i>Id.</i> at p. 199.)  " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge [in a court trial] or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.]  Ultimately, it is within the [fact-finder's] exclusive province to determine whether an inference that may be drawn from the evidence is, in fact, the only reasonable

---

4    A transcript of a body worn camera recording indicated that at some point, Deputy Garcia told Meneses's siblings that Meneses's behavior—him "being loud, for him scaring you guys"—did not indicate a crime:  "Right now, just because he's talking like this, he hasn't committed a crime.  So technically, there's no reason for us to go up there and get him and kick him out of the house.  So, that's what I'm trying to figure out, if there's a crime here.  Because if this goes sideways and we get into a physical altercation with him, for what?"  After these comments, M.R. told Deputy Garcia that Meneses said, "I'll burn your house down," and that he had habits or behaviors of starting fires.

6

one, a determination that depends on its resolution of conflicting evidence and weighing the credibility of witnesses. . . .'[F]ounded upon the evidence, the [fact-finder] not only is authorized to make any logical and reasonable deduction, but [it] is the exclusive judge of the weight and value of the inference that may be drawn by it . . . .' " (*Id*. at p. 202.)

We view the evidence in light of the whole record, and do not limit our appraisal "to isolated bits of evidence selected by the respondent." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1153.) We also " ' "must judge whether the evidence of each of the essential elements . . . is *substantial;* it is not enough for the respondent simply to point to 'some' evidence supporting the finding, for '[n]ot every surface conflict of evidence remains substantial in the light of other facts.' " ' " (*Ibid*.) At the same time, we keep in mind that a trier of fact " 'may accept some parts of a witness's testimony and reject other parts.' " (*People v. Lopez* (2022) 76 Cal.App.5th 287, 290, quoting *People v. Collins* (2021) 65 Cal.App.5th 333, 345.) " 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1118; *People v. Lagunas* (2023) 97 Cal.App.5th 996, 1004.) But the " 'mere fact that there are contradictions and inconsistencies in the testimony of a witness, or that the truth of his evidence is open to suspicion, does not render it inherently improbable.' " (*People v. Tereno* (1962) 207 Cal.App.2d 246, 251; see also *People v. Moreno* (1938) 26 Cal.App.2d 334, 336.)

" 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

7

II.  *Sufficiency of Evidence of Criminal Threats Against K.R. and M.R.*

Meneses contends the evidence is insufficient to support his criminal threat convictions as to K.R. and M.R. because there is no evidence (1) he specifically threatened them; (2) he intended to communicate his statement to anyone as he was alone in his room; (3) his statements caused K.R. or M.R. sustained fear for their own or immediate family's safety (4) a reasonable person would have feared he would burn down the house and (5) the threat was so clear, immediate, unconditional, and specific that it communicated to M.R. or K.R. a serious intention and the immediate prospect that it would be carried out.

To prove a violation of section 422, the prosecution must prove " '(1) the defendant willfully threatened death or great bodily injury to another person; (2) the threat was made with the specific intent that it be *taken as a threat*, regardless of the defendant's intent to carry it out; (3) the threat was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution"; (4) the threat *caused the person threatened* "to be in sustained fear for his or her own safety or for his or her immediate family's safety"; and (5) this fear was reasonable under the circumstances.' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 809; see also *In re George T.* (2004) 33 Cal.4th 620, 630; *People v. Toledo* (2001) 26 Cal.4th 221, 227-228; *People v. Gaines* (2023) 93 Cal.App.5th 91, 136.)  The offense "does not require an immediate ability or even an actual intention, to carry out the threat." (*People v. Holmes, McClain and Newborn*, at p. 810.)

A.  *Specific Threats to M.R. and K.R.*

As recounted above, the record contains evidence that both K.R. and M.R. told deputies that Meneses said he was going to burn the house down. This was an unconditional and specific threat made while Meneses was in an angry and aggressive state.  The trial court as the finder of fact in this bench trial was entitled to infer from the transcript of the body camera footage that both K.R. and M.R. were present and physically heard Meneses make this threat, and that this threat, as well as his threat to kill "everybody" and "[the] . . . whole family," were directed at them both.  And because both M.R. and K.R. acknowledged Meneses had set fires in the past, the court was entitled to infer Meneses had the means to make good on that threat and intended his words to be taken as a threat.  (See *People v. Brugman* (2021) 62 Cal.App.5th 608, 633 [all surrounding circumstances, including prior history, is relevant to determine gravity and specific intent to make a threat; citing cases].)  Meneses's words were not merely an "angry outburst, made in the heat of an argument" (*ibid*.); they conveyed a "gravity of purpose and an immediate prospect of execution of the threat" (*ibid*.) that resulted in K.R. hiding and calling police, and M.R. shaking, crying, and vomiting, then locking herself and others in a room.  K.R. specifically testified that when she decided to call 911 she feared for her safety, suggesting her fear continued to a point even after Meneses's threat.  M.R. testified based on Meneses's anger that night she was worried for her and her family's safety.  "[A] victim can experience sustained fear even if the fear exists only during the incident itself, as long as the fear during the incident is more than 'momentary, fleeting, or transitory.' " (*Id*. at p. 634.)  The record—viewed in the light most favorable to the People—evidences sustained fear on M.R. and K.R.'s part,

9

which was objectively reasonable under the circumstances, meeting the standards of section 422.

We reject Meneses's arguments to the contrary, which seek to isolate bits of seemingly contradictory evidence or draw inferences contrary to the court's findings. The court was permitted to believe portions of the witnesses' statements or testimony and disregard contrary portions or other inconsistent evidence. For example, Meneses argues the evidence is insufficient as to M.R. because M.R. told deputies that he "wasn't getting mad at me" or he did not "exactly" threaten her. When one deputy asked M.R. if Meneses threatened to "kill you guys," she said, "Well, not me exactly but them," then clarified, "My whole family. Everybody." The court was entitled to disregard M.R.'s other statements to law enforcement downplaying Meneses's conduct and her later trial testimony that Meneses never specifically threatened her that night.

We also reject Meneses argument that K.R. told deputies that he did not "say anything" to her or say he was going to hurt her on the night of the incident. At the referenced part of K.R.'s statement, a deputy asks K.R., "So, tonight he didn't specifically say anything to you? He was going to hurt you?" She responded, "No because I was hiding in my room." The court was entitled to infer that K.R. was talking about events after Meneses had made his initial threat, leading her to hide in fear.

Meneses says no reasonable person would have been in fear given he had "regularly" said he would burn down the house and kill the family or himself, but "never hit or kicked any family member or made any attempt to burn down the house in the past." He argues S.R. did not fear Meneses would commit arson because S.R. did not leave the house, supporting his position about the state of the evidence. But the trial court was entitled to

10

conclude under all of the circumstances that the fear experienced by M.R. and K.R. was objectively reasonable, given Meneses's prior acts of setting fires and the unequivocal words he used on the night of the incident. We note further that M.R. told a deputy that Meneses "hates all my family" and did not think of them as family. She related there was a history of Meneses's aggressive behavior, saying they "know how he gets," describing it as "very aggressive" and saying, "He's very violent." All of these circumstances support the court's finding that their fear was objectively reasonable.

Nor do we agree with Meneses's assertion that the evidence did not show any serious intention on Meneses's part so as to communicate the immediate prospect the threat would be carried out. He again argues his statement did not cause any of the siblings to take precautions "such as leaving the house or warning family members to leave . . . ." He argues his threat was not the siblings' "main concern" when speaking with Deputy Garcia, who had to use "leading questions" to draw out M.R.'s feelings about it. These arguments disregard M.R. and K.R.'s testimony about hiding or locking themselves in their rooms, evidencing their fear. They also seek to draw inferences from the evidence contrary to the court's findings, which this court will not do on our review for substantial evidence.

### III. *Meneses's Section 1538.5 Motion to Suppress*

A. *Background*

Before trial, Meneses unsuccessfully moved under section 1538.5 to suppress evidence of his actions after his arrest, contending that his initial arrest and seizure lacked probable cause. The trial court considered arguments on the motion after the People rested their case. In part, the prosecutor pointed out that he had relied on case law pertaining to exigent circumstances, "i.e., threats of violence, a situation that could turn sour in a

11

moment's notice, . . . and . . . situations where [there is] an immediate need to detain or arrest someone to prevent violence . . . ." The prosecutor asserted the People had met their burden to prove reasonable suspicion to detain Meneses, and probable cause that a crime had been committed given M.R. and K.R.'s sustained fear. He argued, "I think that [Deputy Garcia] had all the information that he had at that time to discuss with his partners and the sergeant to make the determination that an immediate detention needed to occur for the safety of everyone in the house. Again, they don't know if there was fire-starting abilities behind that wall. They had no idea because they weren't up there."

In his argument, Meneses's counsel pointed to Deputy Garcia's assertions that there was no crime and suggested the officer had goaded the witnesses into making their statements about Meneses's threat from them by asking leading questions and improperly interviewing them at the same time. He also argued there were no specific articulable facts in Meneses's threat to generate probable cause: "Perhaps if [ ] Meneses said I'm going to burn the house down where is my lighter, where is my lighter, that may have been enough. If he had a lighter in his hand, I'm going to burn the house down, that might have been a fire. Where is the firewood? Where is the firewood? Where is gas? I got gas in my house. I'm going to burn this place down." According to counsel, just saying, "I'm going to burn the house down" by itself was not enough evidence for the police to enter the house, detain and arrest Meneses. Defense counsel argued the law enforcement officers' presence created the exigency, with Meneses becoming upset after seeing their presence and their guns, and seeing they were refusing to allow him to leave without handcuffing him.

The trial court denied the motion: "[I]t does appear as though the police officers were lawfully on the premises. They were invited to the premises and invited inside the home by family members. Officers were met at the door with a statement from one of the family members indicating that their brother threatened to kill them and burn the house down. [¶] We have police officers conducting an investigation/operation trying to calm everything down during the course of their investigation/operation. It appears as though Mr. Meneses was obstructing their investigation by refusing reasonable requests and making threats to kill the police officers along the way. I do think that the People have met their burden of establishing probable cause."

B. *Applicable Law*

When the seizure of a person amounts to an arrest, the Fourth Amendment requires that "it must be supported by an arrest warrant or by probable cause." (*People v. Celis* (2004) 33 Cal.4th 667, 673.) "Probable cause is shown 'when the facts known to the arresting officer would persuade someone of "reasonable caution" that the person to be arrested has committed a crime.' " (*People v. Zaragoza* (2016) 1 Cal.5th 21, 57.) " 'To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause.' " (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 237.) "An arrest remains lawful under the Fourth Amendment even when the 'criminal offense for which there is probable cause to arrest' is different from the 'offense stated by the arresting officer at the time of arrest.' " (*Id.* at pp. 237-238.)

Where the underlying facts are undisputed, this court independently reviews whether the facts constitute probable cause for an arrest. (*People v. Zaragoza, supra*, 1 Cal.5th at p. 57.) " '[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts.' [Citation.] It is incapable of precise definition. [Citation.] ' "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt," ' and that belief must be 'particularized with respect to the person to be . . . seized.' " (*People v. Celis, supra*, 33 Cal.4th at p. 673; see also *Kaley v. United States* (2014) 571 U.S. 320, 338 ["Probable cause, we have often told litigants, is not a high bar:  It requires only the 'kind of "fair probability" on which "reasonable and prudent [people,] not legal technicians, act" ' "].)

"A defendant may move . . . to suppress as evidence any tangible or intangible thing obtained as a result of a . . . seizure" if the seizure "without a warrant was unreasonable." (§ 1538.5.) When a defendant makes such a motion, the People have "the burden of proving that the warrantless . . . seizure was reasonable under the circumstances." (*People v. Williams* (1999) 20 Cal.4th 119, 130; see also *People v. Vannesse* (2018) 23 Cal.App.5th 440, 444-445.) But the defendant " 'must inform the prosecution and the court of the specific basis for their motion.' " (*People v. Silveria and Travis, supra*, 10 Cal.5th at p. 235; see also *People v. Oldham* (2000) 81 Cal.App.4th 1, 11-13, 15.)

On appeal, " 'we defer to that court's factual findings, express or implied, if they are supported by substantial evidence. [Citation.] We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment.' " (*People v. Silveria and Travis, supra*, 10 Cal.5th at p. 232; see also *People v. Vannesse, supra*, 23 Cal.App.5th at p. 445.) " ' "[T]he power to

14

judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court." [Citation.]  Consequently, if an inference is permissible under the evidence and it upholds the trial court's decision, we must presume that the trial court drew it.  Thus, we must "view the facts upon which the suppression motions were submitted in the light most favorable to the People, drawing therefrom all reasonable inferences in support of the trial court's order denying the motions." ' " (*Vannesse*, at p. 445.)

C.  *Analysis*

Meneses contends the trial court erred by denying his motion to suppress the statements he made during his assertedly illegal detention and arrest.  In making this argument, he incorporates by reference arguments he makes as to the sufficiency of the evidence relating to his assault and interference with an officer charges.  He argues the court's erroneous ruling was not harmless beyond a reasonable doubt, and thus we must reverse his convictions of assault and attempting to deter or prevent officers from performing their duties.

Meneses recounts the evidence of his conduct toward the officers and eventual arrest in detail.  But he acknowledges critical facts: that in response to K.R.'s 911 call, deputies contacted K.R. and others upon arrival, and Deputy Garcia was told Meneses had threatened to light the house on fire, causing him to believe a crime had been committed.  In her 911 call, K.R. reported Meneses, who she thought had a pocketknife on him, was "getting

15

really aggressive," trying to fight her brother and threatening her mother.[5] The trial court had heard the People's evidence, including Deputy Garcia's testimony, before considering arguments on Meneses's motion and found deputies were lawfully present, obtained information that Meneses had threatened to kill family members and burn the house down, and found the existence of probable cause. The trial testimony and transcripts of the recorded body camera footage recounted above support the court's findings. And the court, the sole judge of credibility, credited Deputy Garcia's testimony that he gathered this information and made his probable cause determination early on while the deputies were still engaged in a verbal confrontation with Meneses, before deputies formulated their plan to reach him on the upstairs landing. (See footnote 3, *ante*.)

On appeal, Meneses argues both that he was illegally detained at the top of the stairs, and also unlawfully arrested. But Meneses did not base his section 1538.5 motion on a theory of illegal detention, so the prosecutor had no reason to adduce testimony on this point and the court had no reason to focus its analysis on evidence supporting that theory. This entitles us to disregard the illegal detention claim. (*People v. Silveria and Travis*, *supra*, 10 Cal.5th at p. 235; *People v. Oldham*, *supra*, 81 Cal.App.4th at p. 15.) But even assuming officers detained Meneses, it would be "reasonable under the Fourth Amendment [if] the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in

_____

5    Though a warrantless entry into a home is presumptively unreasonable, the presumption may be overcome by showing a need to protect life or avoid serious injury to persons inside the home. (*People v. Rodgers* (2009) 46 Cal.4th 1136, 1156; *People v. Ormonde* (2006) 143 Cal.App.4th 282, 291.)

criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231; *People v. Flores* (2019) 38 Cal.App.5th 617, 627.) "The officer's . . . suspicion must be objectively reasonable, and 'a[ ] . . . detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. [Citation.]' [Citation.] But where a reasonable suspicion of criminal activity exists, 'the public rightfully expects a police officer to inquire into such circumstances "in the proper exercise of the officer's duties." ' " (*People v. Wells* (2006) 38 Cal.4th 1078, 1083.) Under the " 'totality of the circumstances' " (*ibid.*), we conclude Meneses's detention was not unlawful given the specific information provided to the officers at the door about his threat as well as Meneses's agitated and hostile state, his access to weapons, and the presence of other family members upstairs with whom he had been reportedly fighting.

Regarding his claim of unlawful arrest, Meneses' arguments again seek to draw conclusions or inferences contrary to those drawn by the trial court in denying his suppression motion. He makes an argument similar to one we have in substance already rejected, namely, that the fact family members did not leave the house demonstrated they were not in fear or consider his threat serious. He argues deputies "knew or should have known that no one believed [he] was going to burn down the house down or [they] would have left." He argues that upon the deputies' arrival, they did not ask him about any alleged threats, and he had assured them the incident was over. He also points out he explained why he was scared of them (a prior incident with police in which he was assertedly injured), explaining his actions, and that deputies should have concluded there was no reasonable suspicion to detain him or probable cause to arrest him. But the court was entitled to consider evidence from the deputies of Meneses's aggressive behavior, the fact he was

17

wielding a long sharpened stick or pocketknife, and the evidence from M.R., K.R. and S.R. relating Meneses's threats and actions before the incident. The argument disregards Deputy Garcia's specific testimony that he determined through Meneses's family members that before Meneses's arrest, there existed probable cause that Meneses had made a criminal threat, which the court credited in denying the suppression motion. We hold the information obtained from the siblings would "likely persuade an objectively reasonable police officer that [Meneses had made a criminal threat]." (*People v. Silveria and Travis*, *supra*, 10 Cal.5th at p. 238.)

Meneses also points to Deputy Garcia's statements to the siblings that he did not see a crime (see footnote 4, *ante*). The transcript shows that the deputy made these statements before K.R. related Meneses's threat to burn down the house. And again, the argument ignores Deputy Garcia's trial testimony that after hearing of Meneses's arson threat he determined before arresting Meneses that a crime had been committed. The court credited that testimony, and we will not disturb its credibility determination.

Meneses refers to trial testimony of the supervising sergeant on the scene who agreed with defense counsel's question that when deputies finally accosted Meneses and removed him from the house there was no probable cause for an arrest. He misconstrues and isolates her testimony. The sergeant later clarified that when Meneses was detained "[a]t that point in time" there was not probable cause "*that I was aware of, no*." (Italics added.) The court was entitled to either reject the sergeant's testimony in favor of Deputy Garcia's, or interpret it as indicating the sergeant *herself* was then not specifically aware of the same facts as Deputy Garcia had obtained from other family members. The sergeant confirmed deputies talked to family members before her arrival, then conducted more "in-depth" interviews later.

18

Meneses misconstrues her statement when he says she testified that after he was removed, "deputies decided to interview witnesses to determine if probable cause existed to arrest [him]."

IV. *Sufficiency of Evidence of Section 69 and Assault Offenses*

Meneses contends there is insufficient evidence to support his assault convictions against the deputies, as well as his convictions of attempting to deter or prevent officers from performing their duties. He first maintains the deputies acted unlawfully in detaining him "after they should have known that he did not and would not commit a crime." He further contends the deputies had no probable cause to arrest him and thus were not acting lawfully when he allegedly assaulted them. Meneses argues he never attempted to deter the deputies' lawful conduct, which is a separate reason to reverse these convictions.

Section 69, subdivision (a) provides: "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon the officer by law, or who knowingly resists, by the use of force or violence, the officer, in the performance of his or her duty, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170, or in a county jail not exceeding one year, or by both such fine and imprisonment."

There are two ways of violating section 69. " 'The first way of violating section 69 "encompasses attempts to deter either an officer's immediate performance of a duty imposed by law or the officer's performance of such a duty at some time in the future." [Citation.] The actual use of force or violence is not required. [Citation.] Further, "the statutory language [of the first clause of section 69] does not require that the officer be engaged in the

19

performance of his or her duties at the time the threat is made . . . ." ' "
(*People v. Kruse* (2020) 56 Cal.App.5th 1034, 1046, quoting *People v. Smith*
(2013) 57 Cal.4th 232, 241.) The second is where a defendant resists an
officer " ' "by the use of force or violence," and it further requires that the
officer was acting lawfully at the time of the offense.' " (*Kruse*, at p. 1046; see
also *In re Manuel G.* (1997) 16 Cal.4th 805, 815 [describing it as
"longstanding rule" that a defendant cannot be convicted of an offense
against a peace officer unless the officer was acting lawfully at the time the
offense against the officer was committed].) " 'The rule flows from the
premise that because an officer has no duty to take illegal action, he or she is
not engaged in 'duties,' for purposes of an offense defined in such terms, if the
officer's conduct is unlawful . . . . [¶] . . . [T]he lawfulness of the victim's
conduct forms part of the corpus delicti of the offense.' " (*In re Manuel G.*, at
p. 815.)

Having concluded the officers did not unlawfully detain or arrest
Meneses, we are left with Meneses's argument that there is no evidence he
attempted to deter their lawful conduct. He repeats and incorporates his
prior argument that "no rational trier of fact could have found that [his]
detention was legal after nine minutes 47 seconds because the deputies had
or should have had all the information necessary to determine that he had
not committed a crime and would not commit a crime." He points out he had
not verbally or physically threatened any deputy, was "conversing with the
deputies and answering their questions," and he was "only threatening to
resist a future *unlawful seizure*" which did not violate section 69.

We cannot agree with Meneses's characterization of the record, which
shows he made threats to deputies who were attempting to calm the situation
and convince him to come down the stairs to them. These threats included

Meneses's statements that there would be "problems" if deputies came upstairs, or that if they did they were "gonna fucking fight or kill each other," or that he would "fucking end you . . . ." These are the sort of remarks plainly intended to stop the officers from approaching him to either detain or arrest him, or come upstairs to check on the safety of other occupants.

Meneses finally contends there was no evidence to prove he violated section 69 as to one of the officers—Deputy Jardinas—because there is no evidence showing that officer was present and could hear him when he was at the top of the stairs or when deputies apprehended him. He points out the People dismissed the assault charge as to Deputy Jardinas (count 4) and maintains the sole evidence related to Deputy Jardinas's interview of M.R. and their mother after his arrest. Meneses argues that nothing shows the deputy was subject to any of his resistance. The People respond that as one of the officers there to assess the situation, Deputy Jardinas was the subject of Meneses's threats.

A section 69 conviction may be committed by a " 'threat, unaccompanied by any physical force' " but "to 'avoid the risk of punishing protected First Amendment speech . . . the term "threat" has been limited to mean a threat of unlawful violence used in an attempt to deter the officer.' " (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 195.) "[A] violation of section 69 through a threat 'requires a specific intent to interfere with the executive officer's performance of his duties.' [Citation.] '[A] present ability to carry out threats is not required if . . . the target of the threat could reasonably fear retaliatory action on some future occasion.' " (*Ibid*.) The " 'threats must be placed and understood in their context.' " (*Id*. at p. 196.)

Here, there is no dispute Deputy Jardinas was present that night, as he interviewed M.R. and their mother. S.R. testified at trial that while police

21

were at the bottom of the stairs, he heard Meneses say that if they came he would "fuck them up." And Deputy Garcia testified that he interpreted Meneses's comments to mean "[t]hat if myself *or my partners* went upstairs that he would hurt us." (Italics added.)[6] Under the circumstances, the trial court could reasonably infer that Meneses's threats of future violence if the deputies came up the stairs were specifically intended to deter or interfere with officers coming up to arrest him or ensure the safety of the other occupants. The court could also reasonably conclude that Meneses would understand that such threats would be communicated to other officers at the scene. It was enough that all of the officers present were the target of Meneses's threats, which were the type of statements intended to deter performance of their duties.

Meneses cites no authority that a threat must be made directly to the face of the target, or that the target must somehow confirm he or she heard it, if there is otherwise evidence that the threat was directed at and intended to deter executive officers from performing duties. In reply, he cites *People v. Hamilton* (2009) 45 Cal.4th 863 for the proposition that a "defendant must intend that the threat be communicated to the target of the threat, which may be done through a third party." But in *Hamilton*, the court found a threatening letter sufficient to support a finding that a defendant violated section 69 where the defendant placed the letter directed to prosecutors with a deputy sheriff, knowing it would eventually be delivered to the prosecutor's office. (*Id*. at p. 936.) The court emphasized that the statute did not require

---

6    Significantly, M.R. told Deputy Jardinas during her interview that before police arrived, Meneses said he would "kill the cops [¶] . . . [¶] if they came." K.R. likewise heard Meneses say he was going to kill police. The court could reasonably conclude that such a threat was communicated in some manner to responding officers.

22

the prosecutors feel threatened, or that the defendant have the present ability to carry out the threats. (*Ibid*.) Rather "[e]vidence that the letter contained the threats was sufficient to support a finding that defendant violated section 69." (*Ibid*.) So too here, evidence that Meneses directed threats at officers who were collectively attempting to perform legal duties was enough to support the section 69 convictions, including as to Deputy Jardinas.

Meneses also cites *People v. Nishi* (2012) 207 Cal.App.4th 954, but that case does not assist him. There, the court held substantial evidence supported a section 69 conviction where the defendant sent an e-mail to an office of the Department of Defense in part complaining about California's Department of Fish and Game unlawfully shooting at mountain lions and stating, "I am armed and will now fire on all Sheriff and Fish & Game after this e[-]mail so either shut them down or put some boots on the ground to join the battle . . . ." (*Id*. at p. 958.) Observing the offense required specific intent to interfere with an executive officer's performance of duties (*id*. at p. 967), the court found the e-mail "convincingly demonstrates an intent to deter officials from patrolling or otherwise performing duties in the Indian Valley Open Space Preserve by threatening to 'fire on' them if they appeared there. Attempts to deter either an officer's immediate performance of a duty or the performance of such a duty at some time in the future constitute a violation of the statute." (*Ibid*.) The court continued: "That the e-mail was not separately or directly sent to the intended victims fails to negate proof of either an attempt to deter or prevent an officer from performing a duty or the requisite specific intent to interfere with the executive officer's performance of duties. *The statute does not require that a threat be personally communicated to the victim by the person who makes the threat*." (*Id*. at pp.

23

967-968, italics added.) *Nishi* confirms that Meneses's threats were not required to be made directly to Deputy Jardinas, as long as it is reasonable to infer they were intended to deter the performance of his and other deputies' duties and that Meneses expected or should have known they would be communicated to the officers at the scene.

DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.

24